F. A. ONTJES et al., Appellees and Cross-Appellants; OLE HOLTA et al., Interveners, Appellees and Cross-Appellants, v. HANFORD MACNIDER et al., Executors, Appellants.

No. 45244.

OCTOBER 20, 1942.

564

Earl Smith and Senneff & Duncan, both of Mason City, and Davis, McLaughlin & Hise, of Des Moines, for appellants.

F. A. Ontjes, of Mason City, D. M. Kelleher, of Fort Dodge, F. F. Faville, of Sioux City, and W. G. Henke, of Charles City, for appellees and cross-appellants.

WENNERSTRUM, C. J.—Plaintiffs originally filed a claim in probate on behalf of the stockholders of the Northwestern States Portland Cement Company against the estate of C. H. McNider, deceased. By virtue of numerous amendments to the original claim, and rulings on motions presented, the issues involved were finally tried as an equity action. There has been no appeal from the court's ruling transferring the trial to the equity court. The trial court allowed only a portion of the claim. Both sides have appealed. .

Plaintiffs and interveners, in seeking to recover on their claim against the C. H. McNider estate, assert: (1) That McNider, as an individual, acquired and sold stock in a corporation in which the Northwestern States Portland Cement Company also had an interest; that as president, director, and general manager of the cement company McNider was acting in a trust capacity in the purchase of the stock which he acquired and held as an individual, and that the profits made by McNider in dealing in these stocks should accrue to the benefit of the cement company, and the McNider estate should be held to account for the profits received by him as a constructive trustee; (2) that the McNider estate should account for claimed losses that were incurred by the Northwestern States Portland Cement Company by virtue of C. H. McNider's selling stock held by the cement company at a price less than the market value; (3) that C. H. McNider, as president, director, and general manager of the cement company, received salaries, presents, and bonuses that were not properly authorized on account of certain limitations placed upon payments of this nature by the statutes of the state of West Virginia, in which state the Northwestern States Portland Cement

Company was incorporated, and that the McNider estate should account for these unauthorized payments.

The defendants have pleaded several defenses, which may be summarized as follows: (1) Plea of statute of limitations, asserting that there was an absence of equitable circumstances to overcome the one-year limitation for the filing of a claim; (2) general denial; (3) plea of ultra vires as to the corporation; (4) general statute of limitations; (5) ratification and estoppel.

The general nature of the claim and the recovery sought from the McNider estate are hereinafter noted. The sum of $2,308,153 is sought on the theory that C. H. McNider was an agent or constructive trustee for claimant stockholders in relation to the purchase by McNider of two blocks of stock. One purchase consisted of 1,733 shares in the LaSalle Cement Company, obtained from the Sandusky Cement Company in January 1920, and the other consisted of a purchase of 1,600 shares in the Alpha Portland Cement Company, acquired from Charles Boettcher in June 1921. It is claimants' contention that the amount sought to be recovered on this branch of the claim is the profit realized from the sale of the two blocks of stock purchased by McNider, as an individual, and dividends received while the stock was held by him. The further sum of $60,000 is sought as damages for the claimed negligent sale of 4,742 shares of stock in Alpha Portland Cement Company during the months of May to October 1925, at a price below the then prevailing market. It is also contended, and made a part of the claim against the estate, that $45,000 is due claimants on the theory that illegal and excessive bonuses and salaries had been paid to C. H. McNider by the cement company during the years 1923 to 1927, inclusive.

This particular litigation has heretofore received the attention of this court. For our former decisions, see Ontjes v. McNider, 218 Iowa 1356, 256 N. W. 277, and Ontjes v. McNider, 224 Iowa 115. 275 N. W. 328. As is noted in the two prior appeals, C. H. McNider died testate on October 30, 1928. Hanford MacNider, his son, and May H. McNider, his widow, were appointed executors of his estate on December 4, 1928, and notice of their appointment and proof of publication thereof was filed in the office of the clerk December 27, 1928. On August 6, 1931, F. A. Ontjes, on behalf of the stockholders of the Northwestern States Port-

land Cement Company, filed a claim against the estate. This claim, although subsequently amended several times, sought the recovery of certain amounts which were substantially as have heretofore been set forth. Prior to the first appeal many voluminous pleadings were filed. The first appeal to this court was occasioned by the lower court's refusal to strike a certain pleading and to dismiss certain parties claimed to have been improperly joined in the original proceedings. We reversed this ruling.

The second appeal developed by reason of the trial of the issue as to whether or not equitable circumstances existed that would permit the filing of the claim after the statutory period for filing claims had expired. (Section 11972, 1927 Code.) This portion of the litigation was tried before Honorable T. A. Beardmore. We held on the appeal from his ruling that it was not an appealable order but that "it will inhere in any final judgment that may be entered in the trial of the claim upon its merits, and may be considered and determined upon an appeal from such final judgment." Ontjes v. McNider, 224 Iowa 115, 137, 275 N. W. 328, 339. Consequently, this court dismissed the second appeal.

The last trial was upon the merits of the claim, this portion of the litigation having been submitted to Honorable Henry N. Graven. Judge Graven held that Judge Beardmore's order of June 11, 1936, wherein he held that there were equitable circumstances that would permit the filing of the claim, was res adjudicata and was not subject to review by him. In his decision on the general merits of the case, Judge Graven (1) disallowed, in its entirety, the claim for $2,308,153, based upon the acquisition by C. H. McNider of certain stock from the Sandusky Cement Company and Charles Boettcher; (2) allowed $30,014 and interest for the negligent sales by McNider of Alpha Portland Cement Company stock held by the Northwestern States Portland Cement Company at prices below the prevailing market price; (3) allowed $27,916.66 and interest for illegal bonuses and salaries paid by the Northwestern States Portland Cement Company to McNider. Costs were taxed 60 per cent against claimants and 40 per cent against the estate. The executors were given permission to appeal. As previously stated, all parties have appealed.

This appeal now before us necessitates our consideration

not only of the matters passed upon by Judge Graven in the trial on the merits of the case, but also, to a certain extent, the issues presented in the trial before Judge Beardmore relative to the question of the existence of equitable circumstances that would permit the filing of the claim after the statutory period had expired. (Section 11972, 1927 Code.) This involves Judge Beardmore's ruling of June 11, 1936, which received our preliminary consideration in our second opinion of Ontjes v. McNider, 224 Iowa 115, 275 N. W. 328, previously mentioned.

The record in this case is voluminous. The trial of the first case, in regard to the question as to whether equitable circumstances existed so as to permit the delayed filing of the claim, required three weeks' time, and the second trial, on the merits of the case, continued for seven months to a day. Thousands of pages of record have been presented and read, and many thousand exhibits were introduced and have been considered. If industry in the presentation of the issues, the time elapsed since the case commenced, or the amount involved, are the criteria by which it may be judged, this litigation can well be termed causa celebris. It will be impossible, within the limits of this opinion, to set out all the evidence presented or comment on the many exhibits introduced, but we shall endeavor to note the general facts upon which the various contentions are based. There is very little, if any, dispute in the evidence. The difficulty arises in the application of the law to the facts.

The Northwestern States Portland Cement Company was incorporated in 1906. C. H. McNider was a stockholder from the time of its original incorporation until his death on October 30, 1928. Mr. McNider was elected president and general manager of the company late in 1911. He was also at that time a director. He held the office of president, general manager, and director from a period late in 1911, and continued in these offices as long as he lived. During the same period of time that McNider was the active head of the Northwestern States Portland Cement Company he was also president of the First National Bank of Mason City and was the active head of that large institution. He was a very wealthy man and was interested in many business enterprises. He had extensive holdings in mortgages, stocks, securities, and farm lands. He was named as a director of the

Federal Reserve Bank of Chicago at the time of its organization and continued to act in that capacity until his death.

Under the management of Mr. McNider the cement company developed into a sound business institution and its prior-issued bonds and preferred stock were retired out of earnings.

Prior to 1919 a cement plant owned by the German-American Portland Cement Company was operated at LaSalle, Illinois. During the first World War some 3,637 shares of stock in this company, of a total issue of 4,500 shares, were seized as alien-enemy owned, and thereafter held by the alien property custodian. Subsequent to the seizure of this stock the name of the company was changed to the LaSalle Portland Cement Company. In 1919 the alien property custodian advertised for sale the stock held by him in the last-named company. This stock was purchased March 10, 1919, in substantially the following proportions: Charles Boettcher, of Denver, Colorado, one third; Sandusky Cement Company of Sandusky, Ohio, one third; C. H. McNider, one ninth; A. Y. Gowen, of Lehigh Portland Cement Company, one ninth; Theodore Dickinson, of Marquette Portland Cement Company, one ninth. A. C. Dustin, of Cleveland, Ohio, acted for the syndicate and represented them in the purchase. The price paid was $286 per share, which sale was confirmed and approved May 14, 1919. Later, the remaining shares in the company were obtained through the alien property custodian and from other stockholders, and consequently a division of all the stock purchased was made so that each of the original purchasers held the same proportionate share as heretofore set out.

The evidence discloses that on May 12, 1919, McNider and Gowen gave their joint note to the Fort Dearborn National Bank of Chicago for the sum of $246,532, with a collateral-trust receipt for 900 shares of LaSalle Portland Cement Company stock as security. A draft for the amount of money previously mentioned was issued to Dustin. On May 21, 1919, McNider and Gowen gave a further note to the Fort Dearborn National Bank for $39,-525.35, and a collateral-trust receipt for 90 shares of LaSalle Portland Cement Company stock was deposited as collateral. A cashier's check for the amount of the last loan obtained also was issued to Dustin.

All of the LaSalle Portland Cement Company stock pur-

chased for the syndicate by Dustin was put in his name or issued in blank and delivered to him. This particular stock was not divided. However, a new corporation was formed later by the members of the syndicate and the new company was designated the LaSalle Cement Company. Thereafter 12,870 shares of stock, of the par value of $100 per share, were issued by the new company. A certificate for 1,430 shares was issued to McNider. A like certificate for 1,430 shares was also issued to McNider because of his association with A. Y. Gowen in the purchase and in the loan obtained from the Chicago bank.

On June 17, 1919, Mr. McNider reported at a meeting of the board of directors of the Northwestern States Portland Cement Company that he had bought 1,430 shares in the LaSalle Cement Company. He offered it to the Northwestern States Portland Cement Company for the amount that he had paid for it. The matter was discussed by the members of the board, and the record discloses that not all of the members of the cement company's board of directors were particularly favorable to purchasing this stock. However, on the last-mentioned date a resolution was unanimously passed authorizing the purchase of the LaSalle Cement Company stock. McNider's half of the Fort Dearborn National Bank loan, $143,000, with interest, was paid by means of a Northwestern States Portland Cement Company's check dated July 18, 1919, made payable to "C. H. McNider, trustee," in the sum of $144,220.41. This check was endorsed as follows: "Draft to order of Fort Dearborn National Bank, Chicago, a/c LaSalle Cement Stock, C. H. McNider." A draft for the amount of the cement company's check was issued by the First National Bank of Mason City and made payable to the Fort Dearborn National Bank. The stock purchased by the cement company was issued in the name of C. H. McNider. It was held in his name, as then explained, because it would afford greater ease in transferring it, rather than to have it held in the name of the cement company. The stock certificates were endorsed in blank by Mr. McNider and delivered to the company and were held by other officials than McNider during the time the company held them. Mr. McNider accounted to the cement company for all dividends, including stock dividends, received on this stock and a report as

to its sale was made to the company when it was sold. However, the claimants challenge the accounting made, asserting that the cement company did not receive the amount it should have received considering the then claimed market price at the time of sale. This phase of the case will be commented on later in connection with the alleged negligent sale of the stock below its claimed market value.

On or about January 13, 1920, a meeting of the principal stockholders of the LaSalle Cement Company was held in Chicago to consider the purchase of property of the Ironton Cement Company of Ironton, Ohio. Representatives of the Sandusky Cement Company, along with Charles Boettcher, A. Y. Gowen, and C. H. McNider were present. The Sandusky Cement Company's representatives consented to the purchase of the Ironton property but indicated a disapproval of further expansion. They there announced that they would dispose of their LaSalle Cement Company holdings or buy out the others. It was stated that they did not wish to be connected with an enterprise that they did not control. By reason of negotiations at that time, Boettcher, McNider, and Gowen agreed to purchase the Sandusky Cement Company's holdings in the LaSalle Cement Company for $429,-000, plus one third of the net earnings of the LaSalle Cement Company during 1919. A tentative agreement was entered into, which was evidenced by a written offer on the part of the Sandusky Cement Company to sell, which was accepted in writing by McNider and Boettcher. McNider and Boettcher, although they accepted the agreement on their own behalf, according to the evidence, had other individuals associated with them in the purchase. It is the contention of the claimants that C. H. McNider attended the January 1920 meeting of the syndicate holding the LaSalle Cement Company stock, as an officer, director, agent, and trustee of the Northwestern States Portland Cement Company. It is further contended that at that time C. H. McNider did not own any LaSalle Cement Company stock in his own name. It should be kept in mind that the stock in the LaSalle Cement Company owned by the Northwestern States Portland Cement Company had then been issued and was in the name of C. H. McNider. It should also be kept in mind that, even though a portion of McNider's original notes to the Fort Dearborn National Bank

had been paid by the Northwestern States Portland Cement Company's check, yet he was obligated on the note signed with Gowen.

In April 1920, Boettcher acquired Dickinson's one-ninth interest in the LaSalle Cement Company, which Dickinson had purchased at the time of the original transaction with the alien property custodian. This acquisition of stock by Boettcher gave him a greater stock holding in the company than McNider and Gowen. However, in 1921, by reason of correspondence and negotiations by Boettcher and McNider, and with the apparent desire and purpose of equalizing the holding between these parties, there was purchased from Boettcher a portion of his stock by McNider and Gowen.

It is the claimants' contention that the negotiations with Boettcher and the computations as to the several stockholdings at that time were on the basis of the stock held in McNider's name, including the stock owned by the Northwestern States Portland Cement Company. By reason of this last purchase, and the prior acquisition of stock from the Sandusky Cement Company, it is contended that McNider was acting for the Northwestern States Portland Cement Company and that any profits received from the stock acquired through the original holdings should accrue to the benefit of the cement company.

On August 20, 1920, a contract was made by Boettcher, McNider, Gowen, C. A. Irwin, and A. C. Steece, who then owned virtually all of the stock in the LaSalle Cement Company, and which company in turn owned the stock of the Ironton Company, whereby the properties of the LaSalle Cement Company and the Ironton Company were transferred to the Alpha Portland Cement Company for 50,000 shares of stock, of the par value of $100 per share, in the Alpha Portland Cement Company. In November 1920, the stockholders of the LaSalle Cement Company approved the transfer of its assets to the Alpha Portland Cement Company for Alpha Portland Cement Company stock. At that time McNider had 11,978 shares of the LaSalle Cement Company stock standing in his name. This stock represented the 1,430 shares (originally acquired through Dustin and the syndicate purchase in 1919), with a stock dividend thereon of 3,362 shares; the 1,733 shares acquired from the Sandusky Cement Company and a stock dividend thereon of 4,073 shares; also 412 other

shares in connection with the Sandusky Cement Company purchase and a stock dividend thereon of 968 shares. As heretofore stated, the original 1,430 shares were held in McNider's name, but were, in fact, the property of the Northwestern States Portland Cement Company. On these shares there was issued a stock dividend of 3,362 shares, making a total of 4,792. The sum total of shares in C. H. McNider's name was 11,978. For these shares of LaSalle Cement Company stock, McNider received 11,978 shares of Alpha Portland Cement Company stock, of the par value of $100 per share. This stock, representing the par value of $1,197,800, included 4,792 shares, of the par value of $479,200 held in McNider's name but in fact owned by the Northwestern States Portland Cement Company. This is by reason of his sale to it of the original 1,430 shares of stock in the LaSalle Cement Company for $144,220.41. This is the sum which was paid by the Northwestern States Portland Cement Company and discharged a portion of McNider's share of the loan at the Fort Dearborn National Bank of Chicago. The stock also included 5,806 shares, of the par value of $580,600, acquired by McNider through his purchase of 1,733 shares of LaSalle Cement Company stock from the Sandusky Cement Company for $214,500 (plus net earnings of stock during 1919).

McNider became a director of the Alpha Portland Cement Company January 20, 1921. As previously stated, McNider and Gowen, in June 1921, each acquired from Boettcher 1,600 shares of Alpha stock ''to equalize'' the holdings of the three of them in connection with Boettcher's purchase of the Dickinson stock. In the computations that were made, the original 1,430 shares of the LaSalle Cement Company stock and the stock dividends thereon were treated as the property of McNider, without reference to any interest of the Northwestern States Portland Cement Company therein. Boettcher testified that it was to equalize their holdings and particularly because of his purchase of the Dickinson stock that he made the sale at the price that he did to McNider and Gowen. The acquisition of the 1,600 shares by McNider from Boettcher brought the total number of shares of Alpha Portland Cement Company stock standing in McNider's name in June 1921, to 13,578 shares. Of this number of shares, it will be kept in mind, a portion, as heretofore set out, was in

fact owned by the cement company although held in the name of McNider.

It is claimants' contention that McNider acquired the holdings of the Sandusky Cement Company in the LaSalle Cement Company and the 1,600 shares in the Alpha Portland Cement Company from Boettcher, as agent or constructive trustee for the Northwestern States Portland Cement Company, and should account for all earnings and profits from such holdings. It is disclosed by the record that McNider made no formal report to the Northwestern States Portland Cement Company relative to his personal acquisition of LaSalle Cement Company stock, later Alpha Portland Cement Company stock, but there is evidence that he told the directors of the cement company of his purchase and that they had knowledge of his acquisition of both the LaSalle Cement Company and the Alpha Portland Cement Company stock on his own account.

The trial court found, and there is evidence to substantiate this finding, that the directors of the Northwestern States Portland Cement Company were not interested in acquiring more stock than their original purchase in the LaSalle Cement Company which was later merged with the Alpha Portland Cement Company. The court found that McNider acted in good faith and had a right to rely upon the statements expressed by members of the board of directors to the effect that the original block of stock in the LaSalle Cement Company had been purchased from McNider with some misgivings and that they looked with favor upon the disposition of their holdings as soon as possible.

This fact is brought out by reason of a resolution passed by the board of directors of the Northwestern States Portland Cement Company at their meeting of December 19, 1922, which is as follows:

"* * * that the president be authorized to dispose of the Alpha Cement Company stock owned by the company to the best advantage possible. This motion was unanimously carried."

The trial court also found that the individual holdings of McNider in the LaSalle Cement Company, later the Alpha Portland Cement Company, were known to the officers and directors of the Northwestern States Portland Cement Company. The court found that there was no evidence upon which one could

base a finding of a violation of any fiduciary relationship by Mc-Nider or that the acquisition of the LaSalle Cement Company or Alpha Portland Cement Company stock by him had not reacted to the best interests of the Northwestern States Portland Cement Company. The evidence discloses, and the claimants seek to emphasize the fact, that on certain trips made to Chicago and other places, in connection with his acquisition of LaSalle Cement Company stock, McNider was reimbursed for these expenses by the Northwestern States Portland Cement Company.

It is also contended that McNider would not have been in a position to originally acquire the stock held by the Sandusky Cement Company or the stock from Boettcher had it not been for the stock held by the Northwestern States Portland Cement Company. However, in this connection it should be kept in mind that when the Sandusky Cement Company's holdings in the La-Salle Cement Company were acquired McNider dealt with Gowen, as he had originally, and on this occasion, as in the original purchase, personally obligated himself not only for his share of the stock but for Gowen's share as well. There is substantial evidence to warrant the conclusion that the Northwestern States Portland Cement Company would have been unwilling to become a partner of Gowen in such a deal. It also should be kept in mind that in the original transaction, although McNider assumed responsibility for Gowen's share of the original investment in the LaSalle Cement Company, the Northwestern States Portland Cement Company did not enter into the partnership aspects of the deal with Gowen but merely purchased McNider's interest in the stock for exactly what it had cost McNider. In connection with the purchase of the Sandusky Cement Company stock, Boettcher and McNider assumed the original liability of the Sandusky Cement Company for their entire block of stock. Boettcher was later released from his obligation to the Sandusky Cement Company, but this release was because of McNider's ability to pay the whole purchase price. The Sandusky Cement Company had issued notes or debentures to obtain funds to make the original purchase in the LaSalle Cement Company and in the negotiations McNider assumed and paid off these obligations. There is evidence that the Northwestern States Portland Cement Company board at this particular time was interested in the disposition of their then

holdings. This attitude on the part of the board was culminated in the resolution to which reference has been previously made.

It was the trial court's finding that there was no breach of trust by McNider in connection with his relations to the Northwestern States Portland Cement Company in these various transactions, and these conclusions and findings have substantial support in the record. It is impossible in this opinion to set out all the facts, but our careful review of the record causes us to conclude that the trial court was correct in its holding that there was no breach of any trust, constructive or otherwise, on the part of McNider which would make his estate liable for the profits received from the sale of the LaSalle and Alpha stock purchased by C. H. McNider during his lifetime. The trial court's holding as to this major portion of the claim must be affirmed.

I. As previously set forth, claimants seek to substantiate their claim for the profits and earnings on the stock acquired from the Sandusky Cement Company and Charles Boettcher on the theory that in acquiring the two blocks of stock McNider violated a fiduciary relationship with the Northwestern States Portland Cement Company and should be held to be a constructive trustee of such stock, and his estate should account therefor as though the stock were the property of the Northwestern States Portland Cement Company. The briefs of the respective counsel do not disclose any decision of this court that bears directly upon this proposition. In this connection, it might be stated that the research of counsel for the several parties, as well as our independent efforts, have not disclosed a situation quite similar to the facts herein presented.

Inasmuch as it is contended that C. H. McNider acted as a constructive trustee in the purchase of the shares of stock previously mentioned, it is advisable to give consideration to the development of the theory of constructive trusteeship. Bogert, in his work on Trusts and Trustees, 1935, volume 3, 1451–1454, section 471, makes the following comments relative to the nature and development of the principles pertaining to constructive trusteeship:

"The constructive trust may be defined as the device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. When

a court of equity finds that a defendant is the holder of a property interest which he retains by reason of unjust, unconscionable, or unlawful means, it naturally desires to take such interest from the defendant and vest it in the wronged party. This it might do by merely making a decree that the defendant convey to the complainant. But the court must take account not only of the original situation, but also of all the events which have occurred since the defendant began to hold inequitably.

"It must express the idea that the defendant has been under an equitable duty to give the complainant the benefit of the property ever since the defendant began to hold unjustly. The court can express this notion by holding that the defendant has, since the inception of his inequitable holding, been in the same position as if he had been an express trustee of the property for the complainant. To reach the result it desires to get, the court wishes to state that the rights and duties of the parties are to be the same as if the defendant had been, from the beginning of his inequitable holding, an express trustee for the complainant. To obtain this end the court *constructs* a trust. It makes the defendant a trustee by virtue of the decree of the court, for the purpose of working out the ends of justice. * * *

"Obviously this constructive trust is not the product of the intent of the parties. It is not enforced because the parties expressed a desire to have a trust and performed the necessary conveyancing acts. It is merely a tool of the court to work out an equitable result in the simplest fashion. It is created regardless of the intent of the parties, and naturally directly against the intent of the defendant. As well stated by a learned writer, it is a 'fraud-rectifying' trust and not an 'intent-enforcing' trust.

" 'A constructive trust is one not created by any words either expressly or impliedly evincing a direct intention to create a trust, but by the construction of equity in order to satisfy the demands of justice. * * * They are entirely in invitum and forced upon the conscience of the trustee for the purpose of working out right and justice or frustrating fraud.' 'A constructive trust, or as frequently called an involuntary trust, is a fiction of equity, devised to the end that the equitable remedies available against a conventional fiduciary may be available under the same name and processes against one who through fraud or mistake or by any

means ex maleficio acquires property of another.' 'Whenever the circumstances are such that the person taking the legal estate, either from fraud or otherwise, can not enjoy the beneficial interest without violating some established principle of equity, the court will declare him a trustee for the person beneficially entitled, if such person has not waived his right by subsequent ratification or long acquiescence.'

" 'A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. * * * A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief.' Another learned writer has referred to this trust as 'specific restitution of a received benefit in order to prevent unjust enrichment.' ''

The statements set forth in the case of Guth v. Loft, Inc., 1939, 23 Del. Ch. 255, 270, 5 A. 2d 503, 510, affirmed on appeal from Loft, Inc., v. Guth, 1938, 23 Del. Ch. 138, 2 A. 2d 225, disclose the general principles that apply to a corporate officer and director in connection with their duties and relations to the corporation of which they are an officer. The following statements are made by the Delaware Supreme Court:

"Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undi-

vided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

"If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty. Lofland, et al., v. Cahall, 13 Del. Ch. 384, 118 A. 1; Bodell v. General Gas & Elec. Corp., 15 Del. Ch. 119, 132 A. 442, affirmed 15 Del. Ch. 420, 140 A. 264; Trice, et al., v. Comstock (8 Cir.), 121 F. 620, 61 L. R. A. 176; Jasper v. Appalachian Gas Co., 152 Ky. 68, 153 S. W. 50, Ann. Cas. 1915B, 192; Meinhard v. Salmon, 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1; Wendt v. Fischer, 243 N. Y. 439, 154 N. E. 303; Bailey v. Jacobs, 325 Pa. 187, 189 A. 320; Cook v. Deeks [1916], L. R. 1 A. C. 554.

"The rule, referred to briefly as the rule of corporate opportunity, is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents.

"It is true that when a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it, if, of course the

officer or director has not wrongfully embarked the corporation's resources therein. Colorado & Utah Coal Co. v. Harris, et al., 97 Colo. 309, 49 P. 2d 429; Lagarde v. Anniston Lime & Stone Co., 126 Ala. 496, 28 So. 199; Pioneer Oil & Gas Co. v. Anderson, 168 Miss. 334, 151 So. 161; Sandy River R. Co. v. Stubbs, 77 Me. 594, 2 A. 9; Lancaster Loose Leaf Tobacco Co. v. Robinson, 199 Ky. 313, 250 S. W. 997. * * *

⁻"On the other hand, it is equally true that, if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired. DuPont v. DuPont, et al., (D. C.) 242 F. 98, reversed on facts, (3 Cir.) 256 F. 129; Beatty v. Guggenheim Exploration Co., 225 N. Y. 380, 122 N. E. 378; Irving Trust Co. v. Deutsch, (2 Cir.) 73 F. 2d 121, certiorari denied, Biddle v. Irving Trust Co., 294 U. S. 708, 55 S. Ct. 405, 79 L. Ed. 1243; Bailey v. Jacobs, supra; Beaudette, et al., v. Graham, et al., 267 Mass. 7, 165 N. E. 671; McKey v. Swenson, 232 Mich. 505, 205 N. W. 583."

We have quoted quite extensively from this case, inasmuch as it is our conclusion that this late and well-reasoned expression of the Delaware court summarizes the general holdings of the various jurisdictions and the several texts and authorities which we have consulted.

Another recent well-considered case dealing with the question of "corporate opportunity" is that of Solimine v. Hollander, 1940, 128 N. J. Eq. 228, 246, 16 A. 2d 203, 215. In this case the New Jersey court summarizes the holdings of the two opinions in the Loft case, supra, and states:

"It is clear from an analysis of the two opinions in the Loft

Case, as well as of the numerous authorities cited therein, that a finding of 'corporate opportunity' will be denied (a) wherever the fundamental fact of good faith is determined in favor of the director or officer charged with usurping the corporate opportunity, or (b) where the company is unable to avail itself of the opportunity, or (c) where availing itself of the opportunity is not *essential* to the company's business, or (d) where the accused fiduciary does not exploit the opportunity by the employment of his company's resources, or (e) where by embracing the opportunity personally the director or officer is not brought into direct competition with his company and its business. It will be observed that all of the foregoing elements are stated disjunctively and it would therefore seem that the absence of any one of them is sufficient to defeat such claim of corporate opportunity as is made in this case. However, in this case all of these circumstances are absent.''

It is impossible in this present opinion to set forth the many facts involved in the Solimine case, but a reading of it causes us to conclude that the facts therein set forth disclose the nearest approach to the particular problem presented in the present litigation that we have been able to find. The New Jersey court held in this last-cited case that there had not been a violation of a fiduciary relationship and dismissed the action.

The primary question, then, which must be answered in connection with the present litigation is whether or not McNider, in the purchase of the stock in question, took advantage of an opportunity "which, because of the nature of the enterprise is not essential to his corporation, and is one in which it has no interest or expectancy." In such a case, "the officer or a director is entitled to treat the opportunity as his own, and a corporation has no interest in it, if, of course, the officer or director has not wrongfully embarked the corporation's resources therein."

We have concluded that there was nothing in the nature of the enterprise entered into by C. H. McNider which was essential to the cement company or in which it had any interest or expectancy. It should be kept in mind that the stock which McNider acquired for himself at no time belonged to the Northwestern States Portland Cement Company and not any of its funds

were used in purchasing it. The particular contention of the claimants is that the stock which McNider purchased was property in which the cement company had an expectancy, that is, that the company had a right to expect that if McNider acquired such stock he would acquire it only for the Northwestern States Portland Cement Company and not for himself. It is our conclusion that McNider's loyalty to the cement company was not violated by any of his activities in the purchase of the LaSalle Cement Company stock or the later acquisition of Alpha Portland Cement Company stock, inasmuch as the cement company held the original stock acquired solely as an investment. It can also be said that the purchase of the stock by the company was not essential to the company's business. There can be no question that McNider, in his acquisition of the stock, was not brought into direct competition with the company and its business.

It is our conclusion and holding that under the law one who acts in a fiduciary capacity and holds stock or other property for a beneficiary or a corporation as an investment is not disqualified from acquiring similar property for himself if there are absent the circumstances heretofore noted in the Solimine case, supra. If the fiduciary does acquire such property, individually, free from the circumstances previously mentioned, he does not have to account to the corporation or beneficiaries therefor.

It was so held in In re Johnson's Estate, 187 Wash. 552, 555, 60 P. 2d 271, 272, 106 A. L. R. 217, where the testator died possessed of 498 shares of the 500 shares of stock in Johnson Manufacturing Company. The remaining two shares were owned by J. G. Nelson. The testator devised 249 shares to his widow and 249 shares to his four daughters. He named his widow executrix and she qualified as such. The widow purchased for herself Nelson's two shares of stock. The daughters sought to compel her to account for the two shares thus acquired. In commenting upon this situation, the court said:

"In purchasing the stock, Mrs. Johnson was not using trust funds, but was procuring the stock, which was not trust property, by the payment of her individual funds. The fact that, upon the distribution of the estate, the stock which would go to Mrs. Johnson, together with the two shares which she purchased from

Nelson, would give her a majority of the stock, is not of controlling importance.''

In the case of Colorado & Utah Coal Co. v. Harris, 97 Colo. 309, 313, 49 P. 2d 429, 431, the facts disclose that one Harris was president of the coal company from 1914 to 1927, and a director thereafter. It is claimed that Harris, while an officer of the company, secretly purchased for himself valuable coal lands, and the company sought to impress a constructive trust upon them on the theory that the company had an expectancy therein. The court found for the defendant, Harris, and stated:

''These parties are operating in a territory containing coal deposits of vast, we might almost say of unlimited, extent. Such is the condition of this record as to force the conclusion that if plaintiff had an interest in expectancy in the property in question it had a virtual monopoly of extensive fields into which its officers and directors were forever precluded from entering. We find in the authorities, and in reason, no support for such an extension of the doctrine of expectancy. If Harris had no duty to acquire for, or offer to, his company the property in dispute, and we think there is ample evidence to support the trial court's conclusion to the contrary, he had a right to acquire it for himself. Carper v. Frost Oil Co., 72 Colo. 345, 348, 211 Pac. 370. Even had Harris gained all his knowledge through his connection with plaintiff, and even had plaintiff been, in a general way, 'negotiating for and endeavoring to purchase' the interests involved, something more is required to establish the essential expectancy and bar Harris from acquiring individually. Lagarde v. Anniston Lime & Stone Co., 126 Ala. 496, 28 So. 199; Zeckendorf v. Steinfeld, 12 Ariz. 245, 100 Pac. 784. For plaintiff to prove its expectancy, which was the very crux of its case, we think it was bound to establish not only that the properties in question possessed value to it, but that it had a practical, not a mere theoretical, use therefor. * * * ''

In Camden Land Co. v. Lewis, 101 Maine 78, 93, 63 A. 523, 529, 530, the court, in holding that one who was the purchasing agent for a land company was not liable as a constructive trustee of two farms which he had purchased individually, stated:

"The plaintiff also claims that the Sagamore and Sherman farms should be conveyed to it, because it says that the farms were bought for it; that W. D. Lewis, in making the original agreements for purchase, was then acting as its officer and agent. It appears that at a meeting of the stockholders held May 10, 1897, Lewis was 'authorized and empowered to act for the company in the purchase of real estate.' No specific authority or instruction was given to him with regard to any particular parcel of real estate, and so far as appears neither the corporation nor the directors directed him specifically to make contracts for the Sagamore farm or the Sherman farm. * * * We have no doubt that at the beginning of the negotiations and during the greater part of the time after the owners agreed to sell, and until the deeds were given, Lewis intended that these farms should go to the complainant eventually. · All the payments, however, were made by him out of his own funds, or at least out of funds which he thought belonged to him. He charged none of his payments to the company. The company never became bound to purchase either farm, or to repay Lewis for his disbursements. * * * There were no fiduciary or confidential relations between Lewis and the company with respect to these farms out of which a constructive implied trust might arise from the fact that he made the purchase. He had a right to buy the farms for himself, and afterwards to sell them to the company. His intention to do so did not make them trust property. Even if he had agreed to buy them for the company, but had repudiated the agreement and purchased them in his own name, with his own money, the great weight of authority is to the effect that the agreement would be within the statute of frauds and not enforceable, if not in writing. 15 Am. & Eng. Ency. of Law, p. 1187, and cases cited."

In Pioneer Oil & Gas Co. v. Anderson, 168 Miss. 334, 346, 151 So. 161, 164, the president of an oil company negotiated unsuccessfully for an oil lease. Thereafter the secretary-treasurer of the company acquired the lease for himself. The court held that no constructive trust resulted, stating as follows:

"The mere fact that a plaintiff corporation was negotiating for the purchase of certain property did not give it such an interest and expectancy therein as would render a purchase thereof

by its president and secretary a breach of their fiduciary obligation amounting to a fraud. See Lagarde et al. v. Anniston Lime & Stone Co., 126 Ala. 496, 28 So. 199; also compare Greer v. Stannard, 85 Mont. 78, 277 Pac. 622, 64 A. L. R. 722, and annotations thereto.''

In the annotation above referred to it is stated, 64 A. L. R. 784, as follows:

''Generally, it is held that the directors or officers of a corporation are not, by reason of the fiduciary relationship they bear towards the corporation and the stockholders thereof, precluded from entering into and engaging in a business enterprise independent from, though similar to, that conducted by the corporation itself, provided that in doing so they act in good faith and do not interfere with the business enjoyed by the corporation.''

In Carper v. Frost Oil Co., 72 Colo. 345, 348, 211 P. 370, 371, a suit was brought on behalf of an oil company to impress a constructive trust in its favor on certain oil lands acquired by an officer of the company for himself while on a trip on company business. A judgment for defendant was affirmed, the court stating:

''At the time of the transaction complained of, R. H. Malone was the president of the corporation, and defendant W. H. Malone was its attorney, one of the directors, and its general manager. In the course of his employment, he made a trip to the state of Louisiana, and while in that state he purchased some oil lands, or leases thereof, for himself, or for himself and R. H. Malone. This land was not developed at the time of the purchase, and its value was not then a certainty. The evidence does not show that the corporation itself could have purchased the same land or leases at a reasonable price. It was offered to W. H. Malone personally at a reduced figure. Nothing that W. H. Malone did in this connection prevented the corporation from purchasing other properties or leases. Had the transaction not occurred, it is not certain that the corporation would have purchased the property involved in this suit. * * * From all of the evidence in this case it appears that there was no obligation upon the part of either R. H. Malone as president, or W. H. Malone,

as general manager, to purchase the property involved in this suit for their corporation or to offer the same to such company, and they, or either of them, had the right to purchase it for themselves."

The various cases which have been heretofore referred to are sufficient authority for our conclusion that the trial court correctly refused to impress a constructive trust on the stock acquired by McNider from the Sandusky Cement Company and Charles Boettcher. It is our holding that McNider was free to buy this stock personally. The evidence conclusively shows that the directors of the cement company had indicated that they were not interested in purchasing stocks. Then too, they did not need this stock in the conduct of the business. It cannot be claimed that the cement company had an expectancy in any purchases of stock which any of its directors or officers made merely because the cement company held similar stock. The fact that McNider's opportunity to buy the two blocks of stock may have developed by reason of the original holding of the LaSalle Cement Company and the Alpha Portland Cement Company stock in his name for the cement company is not in itself sufficient to create a constructive trust. It would have been necessary to show that he used this official position to the detriment of the corporation. The evidence shows that his holding of the stock purchased by him was not prejudicial to the interests of the Northwestern States Portland Cement Company. There was no conflict of interests between McNider's corporate duty and his self-interest. Inasmuch as this stock was not essential to the corporation, and because of the absence of other essential requirements to constitute a constructive trust, we have concluded that claimants have not sustained this particular portion of their claim.

In further support of our holding, attention is called to the case of Lincoln Stores, Inc. v. Grant, 1941, 309 Mass. 417, 34 N. E. 2d 704. Also, Thilco Timber Co. v. Sawyer, 236 Mich. 401, 210 N. W. 204.

As previously stated, the cement company owned LaSalle stock, later Alpha stock, solely as an investment. McNider could invest his own money in other blocks of the same stock so long as he acted in good faith and did not jeopardize the holdings of

the Northwestern States Portland Cement Company. The trial court held that McNider acted in good faith, that he had a right to believe the Northwestern States Portland Cement Company did not want any more LaSalle Cement Company stock. He did not jeopardize the investment of the company in any way. Although it does not have any particular bearing on the question as to whether or not McNider was a constructive trustee, it should be kept in mind that he did not sell the stock owned by the company at the time the board of directors passed the resolution authorizing and directing its sale. It was not sold until 1925. The stock, in the meantime, had increased in value very materially. As the result of McNider's handling of the LaSalle Cement Company and Alpha Portland Cement Company stock held by the cement company, it made a profit on this investment of more than $300,000. There is no basis for a holding that McNider was a constructive trustee of the stock which he purchased in his own name. The trial court was right in so holding.

There is a further reason why we are disposed to hold that C. H. McNider cannot be said to have been a constructive trustee of the stock that he purchased and held in his own name. This reason is that the claimants have not sustained their contentions by that degree of proof that is required to establish a constructive trust.

Bogert, in his work on Trusts and Trustees, 1935, volume 3, 1459, section 472, in commenting on the degree of proof essential to establish a constructive trust, states that "clear and convincing" evidence is required.

In the case of Matt v. Matt, 156 Iowa 503, 520, 137 N. W. 489, 495, this court said:

"In order to find a constructive or resulting trust in such a case, the evidence must be clear and satisfactory. It has been said that the evidence in such a case must be 'practically overwhelming.'" (Citing cases.)

This court, in again commenting as to the degree of proof required to establish a constructive trust, in the case of McMains v. Tullis, 213 Iowa 1360, 1366, 241 N. W. 472, 474, said:

"An implied or constructive trust may be established only on clear, convincing, and satisfactory evidence." (Citing cases.)

The Illinois Supreme Court in Catherwood v. Morris, 345 Ill. 617, 636, 178 N. E. 487, 494, made the following comment relative to the proof required to create a constructive trust:

"Proof to establish a constructive trust must be clear, convincing, and so strong, unequivocal and unmistakable as to lead but to one conclusion. If the evidence is doubtful or capable of reasonable explanation upon a theory other than the existence of the trust it is not sufficient to support a decree declaring and enforcing the trust. Winkelman v. Winkelman, 307 Ill. 249 [138 N. E. 637]; Streeter v. Gamble, 298 id. 332 [131 N. E. 589, 23 A. L. R. 1485]."

See, also, Edmundson v. Friedell, 199 Ind. 582, 159 N. E. 428, 431.

It has also been stated by the Supreme Court of Arkansas, in the case of Coleman v. Wegman, 172 Ark. 132, 288 S. W. 376, 377, that proof sufficient to establish a constructive trust must be "clear, satisfactory and convincing."

A review of our own authorities, as well as those of other jurisdictions, causes us to again state that to establish a constructive trust the evidence must be convincing, clear, and definite. It should be kept in mind, as stated by Bogert, supra, that the court in creating a constructive trust *constructs* it. A court should not indulge in this legal act of building a trust unless the proof is most convincing. We find that the degree of proof required to establish a constructive trust is absent in this case.

There is no similarity in the present case to the facts noted in the Loft case, supra, where it was held that a constructive trust should be established. We have given consideration to the authorities cited by claimants bearing upon this question, but we do not consider them as controlling.

Inasmuch as we have found that there is no liability on the merits, the question as to whether or not equitable circumstances existed to warrant the filing of a claim after the statutory period becomes immaterial.

II. The trial court allowed the sum of $30,014 on that branch of the claim which alleged that there had been a negligent sale of the Alpha Portland Cement stock through the First National Company, and in connection therewith disallowed a further

branch of the claim based on the sale of Alpha stock to one Dinsmore, an associate director in the Northwestern States Portland Cement Company, by McNider.

The Northwestern States Portland Cement Company at one time held 4,792 shares of the Alpha Portland Cement Company stock. On March 26, 1923, 50 shares of this stock were sold at $75 per share through the First National Company of Mason City, Iowa, and a $50 commission was paid that company on the transaction. There is no claim or assertion that this first sale of stock was illegally or negligently made. The evidence discloses that 3,000 shares of the Alpha Portland Cement Company stock owned by the Northwestern States Portland Cement Company were purchased by the First National Company in co-operation with two associates, from May 27, 1925, through September 28, 1925. C. H. McNider, acting for the Northwestern States Portland Cement Company, sold the stock in question to the First National Company. It is also shown that 742 shares were also presumably purchased by the First National Company on their individual account. As previously noted, C. H. McNider was president of the Northwestern States Portland Cement Company and a member of its board of directors. C. H. McNider and Hanford MacNider were both members of the board of directors of the First National Company, an investment company which was engaged in the purchase and sale of securities. It is disclosed by the evidence that C. H. McNider's interest as a stockholder in the First National Company was greater than his interest as a stockholder in the Northwestern States Portland Cement Company. The trial court held that there was an adversity of interest, whether it be figured on the holdings of C. H. McNider alone or of C. H. McNider and his wife, May McNider, together, or C. H. McNider, May McNider, and Hanford MacNider together, all of whom were stockholders in the First National Company. Nothing would be gained by setting out the respective holdings of McNider in the two corporations. However, the evidence discloses that C. H. McNider's interest in the First National Company during all the time that there were any transactions between that company and the Northwestern States Portland Cement Company in connection with the sale of the

Alpha Portland Cement Company stock was from twenty to thirty times greater than his interest in the Northwestern States Portland Cement Company. It is contended by the executors of the estate that the First National Company and its associates were creating and building a market for the Alpha stock. However, we have a situation where an agent charged with the sale of corporate stock on behalf of his principal is, in legal effect, selling it to himself. The trial court held, and rightfully so, that where an agent is authorized to make a sale and thereafter sells to himself he is legally chargeable with what the property might have brought. The court held that that portion of the claim based on the sale of the stock to the First National Company was allowed on the theory of what the stock might have reasonably brought if C. H. McNider had not in effect sold the stock to himself. The trial court, in its findings, held that there was no intent on the part of C. H. McNider to commit any intentional fraud on his principal in connection with this stock transaction, but, because of adversity of interest on account of stock ownership, Mr. McNider was placed in the situation where the strict and vigorous rules of law relative to an agent with an adverse interest were applicable. We approve of this holding.

It is the contention of the defendant executors relative to the question of their liability concerning the sale by C. H. McNider of the 3,742 shares of Alpha stock to and through the First National Company that there can be no recovery because of their plea of laches and the general statute of limitations. The evidence discloses the fact to be that not until the last trial had been in progress for some time was the discovery made as to the adversity of interest on the part of C. H. McNider. The trial court found that, because this information as to adversity of interest was not earlier obtainable, this phase of the claim cannot be barred by either the statute of limitations or by laches. This holding was proper.

In connection with the question as to whether there were equitable circumstances that would justify the late filing of the claim relative to the negligent sale of the stock after the statutory period had passed, we find, in the record of the case on equitable circumstances tried before Judge Beardmore, some pertinent facts. It is disclosed by the testimony of W. H. L. Mc-

Courtie that, while he was president of the Northwestern States Portland Cement Company during the year 1929, he gained no information or knowledge at that time that the stock sold through the First National Company and its associates was disposed of at a price below the then open-market price. The profit to the First National Company for its one-third share in connection with the sale of the 3,000 shares of stock was over $6,000. The record further shows that in connection with the claimed sale of the 742 shares to the First National Company this block of stock was sold at a price of $120 per share when the price on the open market at that particular time was approximately $135 per share. The difference in value on this particular block of stock was over $11,000. It was further disclosed by the deposition of John J. Matthes, treasurer of the Alpha Portland Cement Company, taken in September 1932, that the 742 shares claimed to have been sold to the First National Company in 1925 by the Northwestern States Portland Cement Company was not in fact transferred to the First National Company but remained in the name of C. H. McNider until 1928, when it was disposed of by him for more than $30,000 above the purported sale price in 1925.

It should also be kept in mind that, as shown by the record in the case on equitable circumstances, C. H. McNider had received a letter from G. S. Brown, president of the Alpha Portland Cement Company, dated September 23, 1925, advising him of a proposed 25-per cent stock dividend. Concerning this letter Hanford MacNider testified that he did not ''know of anyone who knew of this letter until after the claim was filed in August, 1931.''

The claimant did not obtain information concerning the facts above related from any one source. It was obtained as the result of arduous investigation by F. A. Ontjes, acting on behalf of himself and other claimants. It necessitated several trips to the offices of the Alpha Portland Cement Company in Eaton, Pennsylvania, by Mr. Ontjes, where he had conferences with the officials of that corporation. It will also be observed that the stock was held in McNider's name until 1928. The fact that it was not transferred to the First National Company was not disclosed until the deposition of the treasurer of the Alpha Portland Cement Company was taken in September 1932.

We have concluded that there were ample grounds for the court, in the case on equitable circumstances, to hold that the delayed filing of the claim was justified and that the claim should stand for trial upon its merits. It should also be kept in mind that at the time of the opening of his father's estate, Hanford MacNider was a member of the board of the Northwestern States Portland Cement Company and chairman of the board of directors. He was at this time also one of the executors of the C. H. McNider estate. As a representative of the Northwestern States Portland Cement Company, he owed a duty to that corporation to see that proper claims were filed against his father's estate.

It was stated in the case of In re Estate of Sterner, 224 Iowa 617, 626, 278 N. W. 216, 221, in which case it is shown that Paul W. Sterner was a director of a bank and also administrator with will annexed of the estate of his father, as follows:

''It was the duty of Paul W. Sterner and the other directors and officers to look after the interests of the bank, and this required that they use diligence in collecting obligations owing to the bank, so that, if reasonably possible, its business might be conducted with safety to its depositors and creditors and profit to the stockholders, but, in any event, so that, if the business of the bank should result in loss, the depositors and creditors, as well as the stockholders, would not suffer because of the failure of the officers and directors to collect such obligations. It was, therefore, the duty of Paul W. Sterner and other officers and directors of the bank to see that the bills receivable covered by the guaranty agreement of Sterner and the other guarantors were paid by the makers of such bills or the signers of the guaranty agreement. It was also the duty of Paul W. Sterner and the other officers and directors of the bank, in case any of the makers of the bills receivable or signers of the guaranty agreement died, to see that a proper claim was filed against the estate of such deceased person. It is apparent that the filing of such a claim against the estate of Milton R. Sterner would have been against the personal interests of Paul W. Sterner and his sister, as legatees and devisees under their father's will, because whatever would be received by them eventually from the estate would be diminished by any amount required to be paid by the estate upon the claim of the bank.''

It was further said in this last-cited case, at page 629 of 224 Iowa, page 222 of 278 N. W.:

"It is well settled that, in determining whether peculiar circumstances exist entitling a claimant to relief from the bar of the statute, this provision of the statute must be liberally construed. Nichols v. Harsh, 202 Iowa 117, 209 N. W. 297; Simpson v. Burnham, Admx., 209 Iowa 1108, 229 N. W. 679; Chicago & Northwestern Ry. Co. v. Moss, Admr., 210 Iowa 491, 231 N. W. 344, 71 A. L. R. 936; Anthony v. Wagner, 216 Iowa 571, 246 N. W. 748; Simpson College v. Drake, Admr., 219 Iowa 30, 257 N. W. 443."

Innumerable citations might be set forth elaborating upon the last-quoted statement. However, our prior holdings to this same effect are well known to the bench and bar of this state and need no further elaboration. We hold that there are ample grounds to justify the trial court's holding that there were equitable circumstances shown to permit the delayed filing of the claim in connection with the portion of the case relative to the negligent sale of the stock.

III. A further branch of the case was based on the sale of 1,000 shares of the Alpha stock belonging to the Northwestern States Portland Cement Company by C. H. McNider to T. H. Dinsmore, an associate director. The trial court held that C. H. McNider did use due diligence in connection with the sale to T. H. Dinsmore, and that, regardless of whether there was any negligence involved in connection with the sale of that particular block of stock, that portion of the claim was barred by the general statute of limitations. The sale of this stock to Dinsmore occurred on June 18, 1925. We also hold that this ruling was correct.

IV. Another portion of claimants' claim pertains to the salaries and bonuses paid to C. H. McNider as president of the Northwestern States Portland Cement Company.

For the years 1912 through 1915, inclusive, McNider received $10,000 as his salary, with no bonus. For the years 1916 through 1919, he received a salary of $20,000, with no bonus payment. We hereinafter set forth the salaries and bonuses paid Mr. McNider during the years of 1920 through 1927, inclusive.

| Year | Salary | Bonus ($5,000 given retroactively at end of year. Bonus: None.) |
|------|--------|-------|
| 1920 | $25,000 | |
| 1921 | 25,000 | None |
| 1922 | 25,000 | None |
| 1923 | 25,000 | $5,000 |
| 1924 | 25,000 | 5,000 |
| 1925 | 30,000 | None |
| 1926 | 35,000 | 5,000 |
| 1927 | 35,000 | 5,000 |

During the years that are involved in the question as to the payment of salaries and bonuses to McNider, the Northwestern States Portland Cement Company was a West Virginia corporation and consequently was subject to the statutes of that state. We hereafter set forth certain portions of the West Virginia statute which pertained to the payment of compensation to corporation officers and directors:

"Sec. 53. Officers and agents; Executive committee.—The board of directors may, subject to the provisions of law and the by-laws, appoint such officers and agents of the corporation as they may deem proper, and also an executive committee from their own number, and may prescribe the duties and compensation of such, *but there shall be no compensation for services rendered by the president or any director as such, unless it be allowed or authorized by the stockholders. * * ** (Acts 1882, c. 96; 1901, c. 35.)" (Italics supplied.) Barnes' Code, 1923, ch. 53, section 53.

A further section of the West Virginia statutes that is applicable to the question now under consideration is the following:

"Sec. 52. Record of directors' meetings; Secretary; Vote by interested directors.—The directors shall cause a record of their proceedings in all directors' meetings to be properly kept by the secretary or assistant secretary of the company, or by a secretary pro tempore. The by-laws of the board of directors may prescribe that such secretary shall be first duly sworn to faithfully and impartially discharge the duties of his office, and that any

person acting as such secretary who shall fail to so discharge his duties shall be liable for all damages occasioned to the corporation by such failure. The records shall be verified by the signature of the person acting as secretary and of the chairman of the meeting. *No member of the board shall vote on a question in which he is interested otherwise than as a stockholder, except the election of a president or other officer or employee, or be present at the board while the same is being considered; but if his retirement from the board in such case reduce the number present below a quorum, the question may nevertheless be decided by those who remain.* On any question the names of those voting each way shall be entered on the record of their proceedings, if any member at the time require it. (Acts 1882, c. 96; 1901, c. 35.)'' (Italics supplied.) Barnes' Code, 1923, ch. 53, section 52.

Claimants contend that the payment of the bonuses was excessive and illegal, and further contend that salary payments in excess of $20,000 a year were also illegal and excessive.

The trial court allowed that portion of the claim relating to the bonus payment of $5,000 made on December 21, 1926, and also allowed the claim pertaining to the bonus payment of $5,000 made on December 20, 1927. The trial court held that all other bonus payments made should be disallowed on the ground that they were barred by the general statute of limitations. (Section 11007(5), 1927 Code.) It further held that the claim for the bonus payments that were allowed should be sustained on the ground of illegality.

The claim as to the salaries was allowed to the extent of $2,916.66 on the 1926 salary paid on December 31, 1926, and as to $15,000 of the 1927 payment. It was the trial court's holding that the claim as to all other salary payments should be disallowed on the ground that they were barred by the general statute of limitations. It was its further holding that the portion of the claim in connection with excessive salaries that was allowed was by reason of the illegal payments.

In connection with the bonus payment made December 21, 1926, the board of directors of the Northwestern States Portland Cement Company passed the following resolution:

''It was then moved by Mr. Dinsmore and supported by all

present that the sum of Five Thousand Dollars be presented to Mr. C. H. McNider as an appreciation of the work he has done to successfully carry on the business during the past year. This was unanimously carried.''

The bonus payment of December 20, 1927, was paid by reason of the following resolution of the board of directors of the cement company at its meeting on that date:

''It was then moved by T. H. Dinsmore and supported by all present that the sum of Five Thousand Dollars be presented to Mr. C. H. McNider as an appreciation of the work he has done to successfully carry on the business the past year. This was unanimously carried.''

It will be observed, by reference to the West Virginia statutes that have been heretofore set out, that they provide that no member of the board of directors of a corporation shall vote on a matter in which that member is interested or be present when the same is considered. It should also be noted that the evidence discloses that McNider was in attendance at the directors' meetings when the resolutions were passed on December 21, 1926, and December 20, 1927, wherein bonus payments were authorized. The resolutions show that they were unanimously adopted. These two resolutions do not show that C. H. McNider did not vote or that he was not present when the voting took place. No other conclusion can be reached from this record but that McNider was present when the matter of the payment of bonuses for the years in question was considered. This was also true in connection with the setting of his salary.

There was introduced in evidence the opinion of the highest court of West Virginia in the case of Felsenheld v. Bloch Bros. Tobacco Co., 1927, 119 W. Va. 167, 192 S. E. 545, 123 A. L. R. 334. This opinion of the high court of West Virginia is to the effect that any salary or bonus paid by a corporation to one of its officers which was not allowed or authorized by the stockholders is ultra vires and void. See, also, Ravenswood, S. & G. Ry. Co. v. Woodyard, 46 W. Va. 558, 33 S. E. 285.

The statutes of West Virginia and the holdings of that state's highest court are ample basis for the conclusions of the trial

court in relation to the allowance of that portion of the claim pertaining to the salary and bonuses which was allowed. As previously stated, the trial court only allowed the claim on the basis of illegal salaries and bonuses covering items within the five-year period. We are of the opinion that the payment of bonuses and salaries made to McNider in connection with his services as president could not be justified by reason of the claim as made by the executors that payments to McNider were in connection with his services as general manager of the corporation.

The contention is further made that the portion of the claim relating to exorbitant salaries and the payment of bonuses was barred by the statute of limitations and that it was not timely filed. This allegation and contention necessitates a further review of the record. It is there disclosed that commencing with 1915 and continuing through 1925 salaries were paid in cash and receipts were taken. It was testified by Andersen, one of the prior officers of the Northwestern States Portland Cement Company, who had knowledge of the handling of the employees and officers account, that the record showed the total drawn for the pay roll and the charge to each department and that the books themselves did not reflect what each individual received. Andersen further testified that from October 1925 to and including 1931 the system of drawing a general pay roll account continued, and that there would be a check drawn for the total amount of the pay roll and it was deposited to an account in the First National Bank. The workmen's pay roll account was separate. Andersen further testified that the general ledger in respect to that pay roll account would not show the salary that each of the salaried employees received. He further testified that certain exhibits would show the salary notation of $1,666.66, but there was no name noted as to whom it was paid. This witness further testified that there was an item of $5,000 referred to in the donation account, dated December 23, 1925, where the name McNider was written in pencil. As to when this notation was made the record does not disclose.

It appears from the testimony in the record that there was a pay roll book of the Northwestern States Portland Cement Company, which was kept in the desk of one Boyles, and that McNider's salary, as well as office employees' salaries, appeared

in this pay roll book. There is testimony to the effect that this particular exhibit which was kept by Boyles covered the years from 1924 to 1927. This book was not open to the inspection of anyone, and it was kept in a locked drawer in Boyles' desk.

From all the facts shown in relation to the salary paid to C. H. McNider, it is quite apparent that a stockholder of the cement company could not have obtained this information. It was not until investigation was made by the complaining claimants that this information was disclosed, and in that respect the disclosure was not voluntarily given but was obtained piecemeal from various sources as claimants proceeded in their preparation relative to the filing of their claim and the later preparation for trial. We conclude that there are equitable circumstances that would justify the delayed filing of the claim relative to salaries and bonuses. As stated in the case of In re Estate of Sterner, supra, the provision of the statute relative to the delayed filing of claims must be liberally construed.

It is contended that the directors of the cement company had knowledge of the salary payments and that this was knowledge to the company. In connection with this contention, it should be kept in mind that salary allowances can be set only by the stockholders of the cement company. No action of this character was taken by the stockholders of the Northwestern States Portland Cement Company. The directors, who should have protected the interests of the corporation, were the persons who had failed to see that the statutes of West Virginia were carried out. A statement in the case of Ventress v. Wallace, 111 Miss. 357, 371, 71 So. 636, 641, L. R. A. 1917A, 971, 978, is applicable to the present situation. It is there stated:

"The very board here complained of has either willfully or negligently kept from the beneficiaries of this estate all knowledge of the wrongs complained of, and in the very nature of things this suit could not have been filed any earlier. Under the circumstances it could not be earlier known that losses had in fact occurred."

We are abidingly satisfied that under all the facts disclosed in this case there were circumstances that justified the delayed

filing of the portion of the claim pertaining to bonuses and excessive salaries.

V. Claimants contend that the court was in error in the division of costs. It taxed 60 per cent of the costs to claimants and 40 per cent against the estate. From our study of the entire record we have reached the conclusion, and here hold, that this division of costs was justifiable and proper.

VI. We hold that costs involved in the appeals presented for our consideration at this time should also be taxed on the basis of 60 per cent to the claimants and 40 per cent against the estate.

In concluding this opinion we would feel remiss if we did not comment on the thorough and painstaking manner with which counsel for all parties presented this matter in the trial court and before this court. We have been unable to refer to all of the many details of evidence presented or to rule upon all the legal questions raised. However, we feel that our comments as made pertain to vital and important phases of the case and are decisive of the issues involved.

By reason of our conclusions and holdings previously announced, we affirm on both appeals.—Affirmed on both appeals.

HALE, SAGER, OLIVER, GARFIELD, and STIGER, JJ., concur.

MILLER, J., concurs specially.

BLISS, J., takes no part.

MILLER, J. (specially concurring)—I thoroughly agree with the holding of the majority opinion in division I to the effect that the estate is not liable on the claim for $2,308,153, sought on the theory that McNider was a constructive trustee of stock in the LaSalle Cement Company and Alpha Portland Cement Company. However, I am unable to agree with the holding of the majority opinion in divisions II and IV wherein recovery is allowed by reason of the sale by McNider of 3,742 shares of stock in the Alpha Portland Cement Company to the First National Company, and recovery is allowed in the sum of $27,916.66 for salaries and bonuses paid to McNider.

As to the claim based upon the sale of stock to the First

National Company, the burden rests upon the plaintiffs to avoid the limitation of the statute by showing that delay in the discovery of the wrong by the corporation prevented assertion of its claim within the statutory period. It has been repeatedly held that the statute cannot be avoided if the party seeking relief (in this case the corporation) had such knowledge or notice as would lead one of reasonable prudence to make inquiries which would have disclosed the wrong. Van Wechel v. Van Wechel, 178 Iowa 491, 496, 159 N. W. 1039; Conklin v. Towne, 204 Iowa 916, 920, 216 N. W. 264; Murphy v. Hahn, 208 Iowa 698, 704, 223 N. W. 756; McGrath v. Dougherty, 224 Iowa 216, 223, 275 N. W. 466; City of Carroll v. Arts, 225 Iowa 487, 489, 280 N. W. 869. I do not think that the statute was successfully avoided. The trial court held that McNider was guilty of no actual fraud. Recovery was allowed upon the theory of constructive fraud only. I am unable to find any wrongful concealment shown by the record. I would hold the claim barred by the statute.

In regard to the payment of salaries and bonuses, the trial court held that such salaries and bonuses, though large, were not excessive in view of the valuable services rendered by McNider. I agree with this finding. While the payment of salaries may have been difficult to learn from the books of the corporation, yet they were shown by such books. The payments were made by the corporation and were known to the corporation, its officers and directors. The corporation is the real party in interest. I am unable to see that the corporation has shown equitable circumstances sufficient to justify the delay in filing the claim in its behalf.