LEROY T. CARLSON et al., appellees, v. RINGGOLD COUNTY MUTUAL TELEPHONE COMPANY et al., appellants.

No. 50257.

(Reported in 108 N.W.2d 478)

750

April 4, 1961.

Frank F. Wilson, of Mount Ayr, and Weible & Stipp, of Forest City, for appellants.

Jones, White & Johnson, of Ottumwa, Thomas E. Mullin, of Creston, and Emmet Warin, of Mount Ayr, for appellees.

SNELL, J.—Two actions consolidated for trial and appeal involve shareholders' rights and ultimate control and ownership of the Ringgold County Mutual Telephone Company, an Iowa corporation, owning and operating a telephone exchange in Mount Ayr.

I. Plaintiffs-appellees are nonresidents of the community who have purchased and admittedly own stock in the company.

They will be referred to as plaintiffs. In the opinion of defendants, plaintiffs are the big bad wolves trying to gobble a succulent morsel, the "marauding outsiders" destroying the peace and quiet and local control of the company. That the individual defendants are disturbed appears without question. To what extent they may be damaged is doubtful.

Defendants-appellants are the company, its officers and directors. They will be referred to as defendants. In the opinion of plaintiffs, defendants are unjustly and illegally denying and destroying plaintiffs' rights. It is obvious that the success of defendants' plans would damage plaintiffs.

Ringgold County Mutual Telephone Company was, until the present controversy developed, a locally owned company operating a telephone exchange in Mount Ayr, the county seat of Ringgold County. It was originally organized in 1917, with its present corporate life existing by virtue of amended and substituted Articles of Incorporation adopted in August 1957.

The authorized capital of the corporation is $10,000, represented by 1000 shares with a par value of $10 each.

To describe the corporate records as informal and incomplete is an understatement.

If there was any satisfactory compliance with the statute requiring the keeping of stock records (section 491.46), we have been unable to find evidence thereof in the record or exhibits. Neither do we find any record of compliance with the statute (491.47) providing for the availability of a list of stockholders.

Employees of the company testified that stock issues and transactions can be traced but it takes some time. From the stock records it is extremely difficult to trace and determine the outstanding shares. Even the accountant for the company was unable to do so with satisfaction. The results are not in balance with simple arithmetic but are close enough for a determination of the major issues herein.

Of the authorized issue of 1000 shares, there were issued up to 1940 a total of 420 shares. Of these, approximately (we use the word advisedly) 62 shares were returned to the company. The defendants urge that these shares are all treasury stock available for reissue.

Giving to the trial court's finding the weight to which it is entitled, the record supports the conclusion that of the 62 shares returned 24 had been canceled and retired, leaving 38 shares as actual treasury stock. The amount of treasury stock might be important in determining what constitutes a majority of stock outstanding and available for reissue by the directors.

In 1958 there were 356 shares outstanding. What happened to the two shares unaccounted for we do not know. (Four hundred twenty shares issued, less the 62 returned, should have left 358.) The outstanding shares were held in comparatively small blocks, mostly by local people.

Plaintiffs are in the business of purchasing, reorganizing and operating telephone exchanges in Kentucky, Illinois and Iowa. They apparently are financially successful and have credit resources. In the spring of 1958 they became interested in the purchase of the defendant company. A representative of plaintiffs met with the directors of the company. An offer of $100 per share for the stock was made and refused.

After a study of the financial statements and assets of the company, plaintiffs determined the net book value of the company was over $68,000 and the net book value per share of the then outstanding stock was about $195. Thereafter, in November 1958, plaintiffs offered $200 per share for all outstanding shares. A general offer in this amount was made by personal contact, letters and advertisements. As a result plaintiffs acquired, by purchase at $200 per share, 203 shares of stock. The company officers and directors had been kept advised of plaintiffs' activities and progress. The stock so purchased was transferred to plaintiffs by endorsement or separate assignment and delivery of the stock certificates. The stock certificates, together with assignments thereof and proxies for voting purposes, were delivered to the officers of the company with a request for transfer and reissue to plaintiffs. This request was and has been refused.

In January 1959 the 203 shares of stock owned by plaintiffs represented a majority of the 356 shares outstanding. Prospective loss of control made the officers and directors unhappy.

At a special meeting of the directors held on January 15, 1959, it was moved, seconded and carried "that the 644 shares

of stock of the company and corporation unsold or any portion thereof unsold be disposed of by sale and transfer to such parties as the Board of Directors may from time to time approve at $40 per share, the treasury stock to be offered and sold first, and upon condition that before any such parties sell said stock they will first offer it to the corporation." Thereafter, defendant directors sold 225 additional shares of stock for $40 per share principally to their families, relatives, friends and employees of defendant company. Coincident with each sale, the purchaser was required to execute a proxy in favor of defendant directors.

The obvious and admitted purpose in selling these additional shares was to maintain control of the corporation in the present Board of Directors. The directors attempt to justify the $40 selling price as an average selling price during prior years. They ignored the fact that a price of $200 per share had previously been suggested by prospective buyers other than plaintiffs and that in January 1959 Cora Robinson, treasurer and manager, bought two shares at $200 per share from a friend.

The proceeds received from the sale of this stock were segregated and deposited in a separate account, so that if the stock certificates were not delivered or if the purchasers wished to return their stock, the money could be refunded.

II. The defendants cry in anguish that plaintiffs follow a course of forcefully or otherwise buying out small companies, voting a sale of the assets to a new company, refinancing with R. E. A. loans, raising rates and milking the companies through salaries; that this is a "part of the warp and woof of the plan and concerted action to take over" the telephone company; and that "the vice of the whole matter is that nonresident people and foreign interests can buy up stock at an inflated price and own and control a company, have very little of their own money in it and get back the inflated price by raising rates and by milking the company." This may well be a "vice" when viewed from the premise of the directors who contemplate the loss of control of the company, but it obviously was not considered as a vice nor as a disadvantage by the people holding the majority of the stock in the company when they had an opportunity to sell

their stock, having a par value of $10 per share, for $200 per share. Neither is it unusual nor illegal for nonresidents to invest money in a local concern or buy stock in a local company with a hope of financial gain.

It is interesting to note that of 356 shares of stock outstanding 203 were acquired by the plaintiffs, leaving 153 other shares outstanding, of which 89 were held by the officers and directors and by relatives or persons with the same family name. Fifteen shares were owned by the cemetery association and the I. O. O. F. Lodge, leaving a total of 49 shares apparently held by unidentified individuals. The cry that the defendant directors are fighting for the welfare of the local community is weakened by the evidence of substantial desertions among their stockholders and by the rather obvious fact that the officers and directors individually are the ones most concerned in retaining local management.

As soon as plaintiffs learned of additional stock being sold at $40 per share, they served notice on the company that they would exercise their pre-emptive rights in any such offer. The directors refused to recognize any pre-emptive rights of plaintiffs.

The plaintiffs admit that their purpose in buying stock was to obtain control of the company.

Early in December 1958, during their stock purchase campaign, plaintiffs attempted to obtain a copy of the by-laws of the company but were unable to do so until January 20, 1959. There were only two copies, one kept in the safe and one hung on the wall in such a place that it would be practically impossible for any visitor in the office to learn the contents.

Two actions were started by plaintiffs. One sought injunctive relief in connection with the stock issue and the other in mandamus to compel the transfer of stock to plaintiffs.

The trial court properly granted the relief sought.

III. Article III of the Articles of Incorporation provides in part as follows: "The amount of capital stock authorized in [sic] ten thousand dollars, divided into shares of the par value of ten dollars each. No stock shall be issued until the corporation has received payment in full thereof, at par value, in cash or equivalent * * *. The capital stock may be increased by

vote of sixty per cetn [sic] in interest, of all stockholders, by the adaption [sic] of amendement [sic] to these articles. When the outstanding capital is increased, additional stock shall be offered to existing stockholders in proportion to their then holdings, at not less than par, providing that such offer shall not be in violation of law or of these articles, or of any by-laws, rules or regulation of this corporation."

Article X provides: "The corporation may amke [sic] and alter by-laws at pleasure, and may authorize the Board of Directors to do so, subject to such restrictions as may be deemed advisable."

The only by-laws are those adopted when the company was started in 1917.

By-law No. 4 provides: "Transfers of stock shall be made only on approval of the Board of directors, and only on the books of the corporation, and as provided by the articles of incorporation and of these by-laws."

By-law No. 5 provides: "Transfers of stock shall be made if and when the old certificate of stock, properly endorsed, shall be surrendered to the Secretary of the corporation; such certificate shall be canceled and new certificate issued in lieu thereof. Upon proof, satisfactory to the Board of directors, of the loss or unintential [sic] destruction of such old certificate, and upon giving to the corporation satisfactory security, by bond or otherwise, against loss to the corporation, a new certificate may be issued. Any such new certificate shall be properly endorsed as a duplicate."

Stock certificates issued by the company prior to January 15, 1958, were in the following form:

"No. _____ _____ Shares

"Ringgold County Mutual Telephone Company

"This is to certify that _____ is the owner of _____ Share _____ of the Capital Stock of the Ringgold County Mutual Telephone Company, transferable only as prescribed by the By-Laws of said Company.

"In witness whereof the said Company has caused this certificate to be signed by its duly authorized officers.

"Done at _____, Iowa, this _____day of _____
_____ 19 _____

_____ _____
President Secretary"

IV. Defendants urge that under Article III of the Articles of Incorporation plaintiffs have no pre-emptive rights to stock issued pursuant to the action of the directors on January 15, 1959.

 Defendants argue that the original authorized issue was for 1000 shares and until these shares are issued there are no pre-emptive rights. They claim the right to issue and sell this stock to whom and for such a price as they determine. To agree to this proposition, in light of the facts disclosed in this case, would be to place a stamp of approval upon an obvious fraud on the holders of the 356 shares of stock outstanding. During over 40 years of existence this company had never issued more than 420 shares of stock; some had been retired, leaving only 356 shares. During these 40 years the shares had appreciated in value from the par value of $10 to an actual market value of $200 per share. The purpose of pre-emptive rights in favor of stockholders is to protect the value of their investment and to maintain their proportionate or aliquot interest in the company. When we have a situation where the number of shares of outstanding stock has been comparatively constant for 40 years and the stock has appreciated in value from $10 to $200 per share, permitting the directors, arbitrarily and for the principal purpose of maintaining control of the company in themselves, to sell additional stock from the original authorization at $40 per share is repugnant to all ideas of fairness and justice and is a complete distortion of the idea that capital stock is sold for the benefit of the corporation.

The cases relied upon by defendants in support of their argument that there are no pre-emptive rights in connection with an originally authorized issue are not factually comparable to the situation here and do not disclose any situations where additional stock is issued and sold for one fifth of the market value of outstanding stock.

V. In discussing paragraph 3 of Article III, defendants argue that the words "outstanding capital" and the words

"capital stock" should be considered together, and that the pre-emptive rights guaranteed to stockholders are limited to situations where the authorized capital stock is increased. The words "capital stock" and "outstanding capital" appear in separate sentences in the same paragraph.

■ We cannot agree to this construction or definition of the terms. The capital of a corporation consists of its funds, securities, credits, and property, of whatever kind, which it possesses. The word "capital" designates that portion of the assets of a corporation, regardless of the source, utilized for the conduct of the corporate business and for the purposes of deriving therefrom the gains and profits. 6 Words and Phrases 65.

Our court, as early as 1896, in Iowa State Savings Bank v. City Council, 98 Iowa 737, 739, 61 N.W. 851, 852, recognized the distinction between capital and capital stock, when it said: "The word 'capital,' as applied to the money of a corporation, may refer to the money paid in by the stockholders for the use of the corporation, and commonly known as the capital stock; but, in a wider and more popular sense, it includes all the money and other property of the corporation used in transacting its business. So long as the profits are not withdrawn from the business, they constitute a part of the capital."

While there are instances where the words "capital" and "capital stock" are used as the equivalent of each other, in a situation such as we have here the words should be clearly distinguished. The "capital" belongs to the corporation, and "capital stock" when issued belongs to the stockholders. "Capital" may be either real or personal property, but "capital stock" is always personal. The "capital" of a corporation is its property, while the "capital stock" of the corporation represents the interest of stockholders in the corporation, and is their property. 6 Words and Phrases 109.

Here the net capital invested in the business was $68,778. This represented the actual value of the property invested in the business and belonging to the stockholders. These assets were owned by the owners of the 356 shares of stock outstanding.

In paragraph 3 of Article III of the Articles it is provided that the capital stock, that is, the stock authorized by the Articles, might be increased by a vote of 60% in interest of all stockholders, and it is then later provided that when the outstanding capital, which in this case would be $68,778, is increased, the existing stockholders have pre-emptive rights.

We hold that the attempted sale of additional stock by the directors clearly constituted an attempt to increase the outstanding capital and that the then existing stockholders had pre-emptive rights to the purchase thereof.

To hold that additional stock over and above that outstanding, and up to the amount originally authorized, could be disposed of solely by action and in the sole discretion of the Board of Directors and without any pre-emptive rights, would place in the hands of the directors the power to practically destroy the property rights of stockholders by the arbitrary and capricious sale of stock to friends and relatives at far less than its actual value. In this case the directors did not have such arbitrary power.

VI. Defendants argue that the context in which the words appear in Article III supports their position. We do not agree. We conclude a contrary intent appears. To us the different wording indicates a different meaning.

VII. It is urged by defendants that prior to the adoption of the amended and substituted Articles of Incorporation it was discussed and understood that the Board of Directors could sell the thousand shares of authorized stock without offering any of it to existing stockholders. Such evidence cannot be considered and accepted as binding upon subsequent purchasers of stock when faced with such an arbitrary and unconscionable dissipation of assets as we have here.

In 32 C. J. S., Evidence, section 892, page 811, it is said: "Parol evidence has been received to explain records of directors' meetings; but it has also been held that the recorded vote of the directors or stockholders of a corporation must be construed by its terms alone, * * * and that parol evidence is not admissible to show the sense in which it was understood by a director or stockholder * * *."

■ In 32 C. J. S., Evidence, section 960, beginning on page 903, it is said: "Parol or extrinsic evidence of the intention of the parties may be received to clear up an ambiguity by reason of which such intention is not definitely expressed; but, where the writing is free from ambiguity, parol evidence is not admissible to show that the real intention of a party was other than that clearly expressed by the writing."

There is no such ambiguity as to entitle defendants to support their position by parol evidence as to their understanding of their own authority.

VIII. Defendants urge that the by-laws give to the directors an arbitrary and absolute right to determine when and to whom shares of stock might be transferred. They argue that a restriction may be placed upon the transfer of stock to protect the rights of the corporation and its original stockholders and to maintain its original form and purpose. The weakness in this argument lies in the fact that here the action of the directors is destructive rather than protective of the rights of the shareholders. The directors are not only destroying the value of the outstanding stock, but they are also attempting to deny to the majority stockholders any voice in the management of the corporation merely because the suspected purpose of the present majority is offensive to the desires and ambitions of the directors.

In support of their argument that the directors had the right to refuse to transfer stock to the plaintiffs, defendants rely upon Mason v. Mallard Telephone Co., 213 Iowa 1076, 1078, 240 N.W. 671, 672, wherein the right of the directors to refuse to recognize the assignment of stock was upheld. It should be noted, however, that in the cited case it was provided in the *Articles of Incorporation:* " 'Any person may become a stockholder of this company and subject to the by-laws, rules and regulations, upon such terms as the board of directors may provide, provided such person be recommended by any two directors.' " The court held that in the absence of compliance with this provision appearing in the Articles the stock was not entitled to transfer. This case is not authority for defendants' position here, for it is said on page 1083: "There is a distinct difference between a restriction in the articles of incorporation and one

760

contained in the by-laws. This difference originated early in the history of corporations."

In Farmers & Merchants Bank of Lineville v. Wasson, 48 Iowa 336, 30 Am. Rep. 398, it is held that a by-law of a corporation which provides that transfers of stock shall not be valid unless approved by the board of directors may not be arbitrarily enforced to defeat the rights of third persons.

In 13 Am. Jur., Corporations, section 335, page 411, it is said that a corporation, in the absence of statutory authority, has no power to adopt by-laws or regulations which prohibit alienation or transfer of its stock without the consent or approval of the corporation or its directors.

██ Restraints on the power to transfer shares of stock are generally regarded with disfavor and must be strictly construed. McDonald v. Farley & Loetscher Mfg. Co., 226 Iowa 53, 283 N.W. 261.

Farmers & Merchants Bank of Lineville v. Wasson, supra, is discussed in an annotation in 65 A. L. R. 1167. This annotation indicates it is the general rule that to be upheld a restriction on the power of alienation must be reasonable and may not be arbitrarily or capriciously exercised.

Recognizing as we do that there is a distinction between power contained in the charter and that contained in by-laws, it should be noted that the authorities repeatedly use the word "reasonable" in connection with by-law authority.

It should be kept in mind that the restriction here appears in the by-laws and not in the Articles of Incorporation.

██ By-laws placing reasonable restrictions upon the transfer of stock and regulating the mode of transfer are authorized. 13 Am. Jur., Corporations, section 335, page 412. A corporation may not refuse to transfer stock merely because of a motive which may have prompted the transferee to acquire it, but it has been held a corporation will not be compelled to transfer stock to one who, in the interest of an active conspiracy against the business of the corporation, seeks information regarding the business, which his position as a stockholder will give him. 13 Am. Jur., Corporations, section 366, page 434. This rule is in line with the Iowa case of Mason v. Mallard Telephone Co., supra.

We find no authority in Iowa holding that a provision, such as we have here appearing in the by-laws, gives directors a purely arbitrary right to control who shall be stockholders in the company.

It is interesting to note that the Iowa Business Corporation Act, appearing as chapter 321, Acts of the Fifty-eighth General Assembly, in section 26, provides: "If the articles of incorporation so provide, the by-laws may contain any provisions restricting the transfer of shares." While this provision is not controlling here, it is clearly indicative of the legislative thinking that restrictions on transfer of stock appearing in the by-laws are effective only when specifically authorized by the Articles.

Forty years ago the telephone stock sold for $10 per share. Even at that price, less than half of the shares were sold. In 1959 and 1960 outstanding shares sold for $200 per share. The by-laws adopted in 1917 cannot be used as a vehicle for the sale in 1960 of shares for a fraction of their true value.

IX. Defendants' argument that there were at least 62 shares of treasury stock available for sale as they saw fit is not supported by the record, nor by the finding of the trial court. The finding of the trial court as to the actual number of shares properly classified as treasury stock reduces the number of shares available to the defendants to maintain control, and maintains plaintiffs' position of owning a majority of stock issued or what could be legitimately issued.

The trial court carefully analyzed the so-called treasury stock and found that 24 shares had been canceled, retired or not established to be stock purchased by the company and held for resale.

Even treasury stock held for resale should not be sold at a price destructive of the value of other stock. The trial court was right.

X. Defendants argue that plaintiffs came into court with unclean hands and are therefore not entitled to relief in equity. Twenty-two pages of defendants' brief and argument are devoted to this proposition, and many cases are cited and discussed. Citation of authority as to the legal principle is

unnecessary. It is axiomatic that one who comes into a court of equity must have clean hands in order to obtain relief.

This proposition of law is of no help to defendants. Plaintiffs have done nothing except buy a controlling interest in the telephone company, to the sorrow of defendants who are now a minority. There is not a scintilla of evidence in the record of any illegal, improper or undisclosed activity on the part of plaintiffs. They came into the community openly and, by word of mouth, mail and newspaper advertising, stated their proposition and their offer. Their offer to purchase was made to all stockholders without discrimination. The mere fact that defendants see the control of the company slipping away does not support the claim that plaintiffs have unclean hands. On the other hand, the action of defendants in attempting to retain control by the issuance and distribution of new stock at less than its actual value, and with an instrument for control attached, can only in charitable words be described as an act of desperation not in keeping with their duties as directors.

The defendants argue that they are fighting to protect the corporation from a boring from within, and to protect the rights of the corporation from being ravaged by outsiders. It can hardly be said that there is a boring from within when we have on one side the ownership of a majority of all outstanding stock and on the other side the officers and directors definitely representing a minority. Neither can it be said that the company is being ravaged when plaintiffs offer to buy all the stock in the company at 20 times its par value and at a price that defendants claim is inflationary. From the standpoint of the stockholders, other than the directors, it would appear that an opportunity to sell at such a price was rather advantageous. If the taking over of the company is a part of "the baneful trend to largeness", that is an argument that should have been addressed to the local stockholders who are citizens of the community. It is a problem outside the jurisdiction of the court. It is not the privilege of a court to inject its judgment into the problem of what is good or bad business. Neither can the courts interfere whenever it may be thought that someone is exercising bad judgment. It is our duty to

say who does own stock, but it is not our privilege to say who should own stock as a matter of public or business policy. Since the time recorded in the book of Genesis, men have persisted in selling their birthrights for a mess of pottage, and courts are powerless to prevent them from making such mistakes.

The cases cited by defendants repeatedly uphold the right of directors to reissue or sell stock for honest purposes and for the benefit of the corporation, but the record in this case does not bring defendants under the protection of such rules.

In 18 C. J. S., Corporations, section 201a, page 631, it is said: "It is a fraud for directors of a corporation, without the knowledge and consent of other stockholders, to subscribe for and to take the unissued stock to the enrichment of themselves and the detriment of the other stockholders."

In 19 C. J. S., Corporations, section 795, pages 175, 176, it is said: "The directors and other officers of a corporation, being in the position of trustees, will not be permitted to obtain an unfair advantage over other stockholders by the issuance of stock to themselves; and if, for the purpose of gaining control of the corporation, they fraudulently issue or transfer to themselves any stock of the corporation, either unissued stock or treasury stock, in violation of the rights of existing stockholders to participate in subscribing for or purchasing the same, or otherwise violate their fiduciary duty to act in the interest of all the stockholders, the transaction is illegal and will be set aside * * *."

In 19 C. J. S., Corporations, section 795, page 176, it is said: "Even though stockholders have no pre-emptive right to subscribe to new issues of stock, they are entitled to demand that the directors and officers do not use their positions for their own personal advantage, or to cause the stock to be issued so as to make a profit for themselves, or to obtain or retain control of the corporation."

Defendants argue that even if the directors' conduct was wrongful, the conduct of appellees was equally wrongful. If this were true, equity would not interfere. The record, however, does not support defendants' claim. The plaintiffs were aggressive, but they operated openly. There was neither fraud nor deception. Plaintiffs' success was distasteful to defendants, but

that does not destroy plaintiffs' right to the protection of the law.

We have examined the rather long record with care and conclude the trial court was correct.—Affirmed.

All JUSTICES concur except BLISS, J., who takes no part.