Beth Thomas LANGE, Individually and as Executor of the Estate of Elmer P. Lange; Mary Beth Williams and Martha Jane Lange, As Individuals; Beth Thomas Lange, Mary Beth Williams and Martha Jane Lange, On Behalf of Themselves as All Shareholders of Madison Holding Company, Similarly Situated, Appellants,

v.

Jean W. LANGE, Gene C. Lange and Madison Holding Company, Appellees.

No. 93–127.

Supreme Court of Iowa.

July 27, 1994.

Rehearing Denied Sept. 21, 1994.

Robert R. Scism of Reavely, Shinkle, Bauer, Scism & Reavely, and Richard A. Miller, Des Moines, for appellants.

Brent R. Appel and Thomas W. Andrews of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellees Jean Lange and Gene Lange.

Gordon K. Darling of Darling & Darling, Winterset, for appellee Madison Holding Co.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

This is an appeal and cross-appeal from the district court's attempt to equitably resolve a family quarrel over control of a closely held corporation. The corporation, defendant Madison Holding Company, was owned and controlled by two brothers, Elmer Lange

and Jean Lange. Upon Elmer's death, Jean—the sole surviving director—took action to wrest control of the corporation from Elmer's widow (and executor) and daughters, plaintiffs Beth Lange, Mary Beth Williams, and Martha Jean Lange. This litigation ensued.

The case was tried in equity. Thus our review is de novo. *Cookies Food Prods. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 448 (Iowa 1988); *Holi–Rest, Inc. v. Treloar*, 217 N.W.2d 517, 523 (Iowa 1974). These are the issues on appeal: (1) whether the court erred in recognizing Jean Lange's right to exercise an option to purchase 600 shares of preferred stock at $100 per share; (2) whether the court erred in characterizing certain stock redemptions effected by Jean Lange as "legally perfected"; and (3) whether the court erred in dismissing Madison Holding Company's claim against Jean Lange for breach of fiduciary duty. For their cross-appeal, defendants assert the court erred in: (1) limiting the corporation's redemption of shares to 1200; and (2) striking the issuance of 2000 shares of Madison Holding Company common stock to Jean Lange. Because we concur in the court's judgment on everything but whether the stock redemption was legally perfected, we affirm in part and reverse in part on the appeal and affirm on the cross-appeal.

## I. Background facts and proceedings.

In the early 1970s, Jean and Elmer Lange, in equal partnership, acquired a majority interest in the Union State Bank of Winterset, Iowa. They decided some years later that formation of a bank holding company would reap desired tax benefits. Such a move required the holding company to own eighty percent of the bank's outstanding stock. Thus Jean and Elmer purchased an equal number of additional shares until collectively they owned more than eighty percent of the bank. They then activated the Madison Holding Company.

At the time the holding company was formed, Jean and Elmer's equal number of bank shares were exchanged for shares of common stock in the company on a one-for-one basis. The company assumed the brothers' debts associated with acquisition of the bank stock. Because Jean transferred $120,000 more debt into the company than Elmer, the company issued Elmer 1200 more shares of preferred stock, at a par value of $100, to Elmer's side of the family. Thus Elmer's family owned 51.84 percent of the company and Jean's family owned 48.16 percent.

Despite the imbalance in stock ownership, the brothers treated one another as equal partners. The record clearly reveals that they intended to equalize their stock holdings at some future time. The family members, other than the brothers, were apparently unaware of the disparity.

One way to equalize formal ownership was for the company to redeem $120,000 of Elmer's preferred stock. In 1982, the company issued two $15,000 checks to Elmer to advance the equalization process. At the time, the bank—like many other Iowa financial institutions—found its very existence threatened by the farm crisis. Its precarious financial position rendered the proposed stock redemption unwise. Thus Elmer returned the $30,000 to the company.

A year later the brothers executed a buy/sell agreement to provide for disposition of company stock upon the death of either of them. The agreement gave the surviving brother an option to purchase common and preferred stock from the deceased brother's wife. The agreement was signed by Elmer, Jean, and their wives Beth and Jeanne.

In 1985 Elmer again set out to formally restore the fifty-fifty partnership. His accountant advised that the company could issue $120,000 in additional preferred shares to Jean, or Jean could purchase 600 preferred shares from Elmer. Jean testified that he and Elmer discussed the accountant's recommendations sometime in 1986 or 1987 and that Elmer agreed to sell Jean 600 shares of preferred stock for $60,000. The transfer was never completed, however, because of continuing concern over the bank's financial stability. On eleven separate occasions during this time period, the brothers invested equal sums—totaling nearly $750,000 each—to keep the bank afloat. Despite the continued discrepancy in share ownership, the

brothers always operated with the understanding that they were equal partners in the enterprise.

Elmer died on May 6, 1990. He left one-half of his estate to his widow, Beth, and the other half equally to his two daughters, Mary Beth and Martha. These heirs soon learned of the disparity in stock ownership and Elmer's unsuccessful attempt to equalize it. Elmer and Jean's longtime attorney, John Schulte, drafted an agreement acknowledging Jean and Elmer's intentions and proposing Jean's purchase of 600 shares of preferred stock at $100 per share. Jean's family signed the agreement, but Elmer's did not. Upon advice of separate counsel, Elmer's heirs expressed their desire to retain majority ownership of the company.

Throughout the brothers' partnership, Jean had assumed responsibility for day-to-day bank management. Elmer supervised other joint ventures. Jean thus became concerned that the bank would be mismanaged or sold if Elmer's heirs continued to insist on majority control. In February 1991, he passed a corporate resolution calling for the redemption of 1500 shares of preferred stock and 1054 shares of common stock from Elmer's estate. Later that month he appointed his son, Gene, director of the company to assume the position vacated by Elmer. The two then amended the earlier resolution by enlarging the proposed redemption of preferred shares by 250. The next day, the directors authorized the issuance of 2000 shares of common stock to Jean in exchange for existing debt.

In August and September of 1991, Jean made an individual purchase of 400 shares of the bank's common stock from outside shareholders. This purchase represented ten percent of the bank's 4000 outstanding common shares.

In April 1991, plaintiffs filed suit alleging Jean had breached his fiduciary duty to the corporation shareholders by causing the issuance of 2000 shares of common stock to himself and by attempting to redeem portions of Elmer's common and preferred stock. Defendants counterclaimed, seeking specific performance of the agreement for the sale of 600 preferred shares from Elmer's estate.

Following bench trial, the court ruled that the 1990 agreement drawn by Schulte represented a valid exercise of Jean's option to purchase under the 1983 buy/sell agreement. It therefore ordered Elmer's estate to transfer 600 shares of preferred stock to Jean in exchange for $60,000. The court voided the issuance of the 2000 additional common stock shares, concluding the action was taken by Jean for the wrongful purpose of acquiring control of the company. It went on to find the attempted redemption of 1750 shares of Elmer's preferred stock "technically and legally valid" but voided the transaction as an inequitable attempt by Jean to upset the balance in ownership between the two families. Finally, the court rejected plaintiffs' amended posttrial claim that Jean usurped a "corporate opportunity" by individually buying 400 additional shares of bank stock. This appeal and cross-appeal followed.

II. Issues on appeal.

A. *Option to purchase 600 shares of preferred stock.* Although Elmer's family refused to endorse the 1990 agreement for the transfer of preferred stock to Jean, the district court ruled that the agreement represented a valid exercise by Jean of the option contained in the 1983 buy/sell agreement. That agreement, aptly described by the court as "confusing" and "inartfully drawn," purported to give the surviving brother the option to purchase, within one year of the other's death, preferred stock held by the decedent's family at a price of $100 per share. Because of the virtually undisputed record of the brothers' cooperative spirit and intention—albeit unsuccessful—to equalize the stock ownership, the court ordered the transfer of 600 shares on equitable grounds.

Plaintiffs advance three arguments for reversal of the court's ruling: (1) that the court's order amounts to an "invention" neither pleaded nor sought by Jean; (2) specific performance cannot be relied upon to enforce a "confusing" agreement; and (3) Jean never tendered the $60,000 necessary to enforce the option. For the reasons that follow, we find no merit in these contentions.

First, although defendants' counterclaim did not specifically seek enforcement of the 1983 agreement, its terms and its relation to the 1990 agreement were very much the subject of trial testimony and argument. Moreover, the court was obliged to regard defendants' request for general equitable relief with considerable liberality. *See Schlotfelt v. Vinton Farmers' Supply Co.,* 252 Iowa 1102, 1112, 109 N.W.2d 695, 700 (1961); *Skemp v. Olansky,* 249 Iowa 1, 6, 85 N.W.2d 580, 583 (1957). Considerations of equity and fairness simply dictate that relief not specifically sought must conform to the case made by the pleadings and proof. *Anderson v. Yearous,* 249 N.W.2d 855, 859 (Iowa 1977). Given the wealth of testimony, from both sides, regarding the 1983 agreement, plaintiffs cannot rightfully claim surprise at the court's reliance on it to fashion an equitable remedy.

Second, we disagree with plaintiffs' claim that the terms of the 1983 agreement are too obscure to be susceptible of enforcement. It is true that the court itself characterized the agreement as "confusing" and "inartfully drawn." Specific performance is a matter of equity, however, resting within the court's sound discretion. *Tri–States Inv. Co. v. Henryson,* 179 N.W.2d 362, 363 (Iowa 1970). We therefore review the court's ruling for evidence of abuse of that standard.

Ordinarily specific performance should not be decreed unless contractual terms are so express that the court can reasonably determine the duty of each party and the conditions under which performance is due. *Id.* The option at issue provided in pertinent part:

Upon the death of either Elmer F. Lange or Jean W. Lange, the survivor may purchase within one year following the death of either Elmer F. Lange or Jean W. Lange, at the values referred to in Article I of this agreement which shall include any common and preferred stock owned by Beth Thomas Lange or Jeanne P. Lange, at the price referred to hereinbefore: Interest [sic] the values of the stock will be figured at ten percent (10%) per annum on the unpaid balance during the year referred to hereinbefore.

Other, more cogent, portions of the agreement provide for a price of $100 for the preferred shares and expressly fix the time for performance at not later than one year from the death of one of the brothers. The purchase price includes interest due on the unpaid balance.

Plaintiffs make much of the fact that the term "purchase" in the paragraph above lacks a direct object, arguing that the contract thereby lacks the necessary subject matter. While we agree that the drafting leaves much to be desired, we think it clear that—when read in context—the verb "purchase" refers to "any common and preferred stock owned by Beth Thomas Lange or Jeanne P. Lange."

The parties' more serious dispute is over the quantity of stock to be purchased under the agreement. As will become more important later, plaintiffs assert that the purchase of *all* of a decedent's stock was required. Defendants respond that use of the term "any" in reference to the common and preferred stock owned by the brothers' wives gave the survivor the option to purchase all, none, or some of the securities. Jean confirmed that this was his understanding of the document. None of the other signatories to the agreement contradicted this understanding. Only Schulte, who helped draft the agreement, took the contrary view that the buy out provision did not permit purchase of less than all of a decedent's shares.

Like the district court, we do not believe the term "any" is ambiguous. *See Wenthe v. Hospital Serv., Inc.,* 251 Iowa 765, 769, 100 N.W.2d 903, 905 (1960) ("any" means "one or all; some; indiscriminately of whatever quantity; one or more"); Black's Law Dictionary 86 (5th ed. 1979) ("any" defined as "some; one out of many; an indefinite number"). When a contract is not ambiguous, we are obliged to enforce it as written. *Iowa Fuel & Minerals v. Board of Regents,* 471 N.W.2d 859, 862–63 (Iowa 1991). We conclude that the agreement contemplates the purchase of one or more of a decedent's shares.

Because the duties of each party and the conditions under which performance is due may be reasonably ascertained from the agreement, the court made no mistake in enforcing it. The object of specific performance is to best effectuate the purpose for which a contract is made. *Folkers v. Southwest Leasing*, 431 N.W.2d 177, 182 (Iowa App.1988). It should be granted upon such terms and conditions as justice requires. *Id.* The evidence adduced at trial indicates that the contract was intended to allow the surviving brother to purchase shares at his option. In addition, uncontradicted testimony reveals that Elmer and Jean wanted an equal relationship. Allowing specific performance of the agreement would best effectuate the parties' intent. *Id.* No abuse of discretion has been shown.

Finally, with regard to exercise of the option, plaintiffs contend that even if the 1983 option is valid, the option was never exercised because Jean never tendered the $60,000 necessary to purchase the 600 shares. When a tender would be of no avail, however, it may be excused. *Lyon v. Willie,* 288 N.W.2d 884, 891 (Iowa 1980). Plaintiffs testified that they knew of Jean's desire to purchase 600 preferred shares far in advance of the expiration of the option. Despite this knowledge, they refused to sign the 1990 agreement for the purchase of those shares because they believed it was not a "good deal." Like the district court, we believe this action constitutes a repudiation of plaintiffs' obligations under the 1983 agreement and as such excuses Jean's failure to tender the $60,000. *Id.*

In summary, we believe the court's order directing the transfer of 600 shares of Elmer's preferred stock to Jean upon payment of $60,000 achieved the equality in stock ownership sought but unaccomplished by the brothers during Elmer's lifetime. Moreover, the order is consistent with the action contemplated under the buy/sell agreement within one year of a partner's death. The court was within its equitable powers to order such relief upon the defendants' request.

B. *Redemption of additional preferred shares.* The district court ruled that the holding company's attempt to redeem 1750 shares of Elmer's preferred stock was "technically and legally valid" but found such redemption inequitable in light of the brothers' intent to equalize stock ownership through exercise of the stock option. It held that only if purchase of 600 shares of stock by exercise of the option failed would Jean be entitled to redeem preferred stock, and then only to the extent necessary to equalize ownership. Plaintiffs assert on appeal that the redemption effort violated the corporate charter, was exercised in bad faith in the absence of a quorum of directors, and violated statutory proscriptions against redemption by an insolvent corporation. Defendants cross-appeal the limitation placed by the court on the redemption effort, claiming the corporate by-laws give the surviving brother the option to go beyond fifty-fifty ownership. We shall consider the arguments in turn.

1. *Validity of redemption.* Preliminarily plaintiffs rest their claim of invalidity on the fact that the resolution signed by Jean authorized the redemption at a price "to be mutually agreed upon" whereas the corporation's amended articles of incorporation clearly require redemption at $100 per share. The district court correctly noted that all provisions of a company's articles of incorporation form part of a contract between the corporation and its shareholders. *Berger v. Amana Soc'y,* 250 Iowa 1060, 1065–66, 95 N.W.2d 909, 912 (1959). The right to redeem stock, therefore, may only be exercised in conformity with the contractual terms. 11 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5309 (perm.ed.rev. vol.1986) (hereinafter "*Fletcher*"). A corporation is restricted to by-laws that are not inconsistent with the law or articles of incorporation. *See* Iowa Code § 490.206(2) (1991). The court held that if redemption were permitted, the price must necessarily be $100 per share. We agree and likewise concur in the court's observation that the plaintiffs' quarrel is not really with the redemption price, but with the redemption itself.

The crux of plaintiffs' claim is that the by-laws contemplated redemption of *all* of a decedent's shares, thus defendants' at-

tempt at partial redemption is void. Unlike the buy/sell agreement which permitted the survivor to purchase "any" of the deceased brother's stock, section 6.4(a) of the company's by-laws allows the deceased shareholder's legal representative to compel redemption of *all* shares owned by the decedent at the time of his death. Section 6.4(b), upon which defendants relied for redemption of the 1750 shares, states:

> In the event the legal representative of the deceased shareholder does not exercise the option provided in subparagraph (a) above, then the corporation shall have the option, commencing upon expiration of subparagraph (a) above, to redeem all of the shares not redeemed by the legal representative....

The district court reasoned that section 6.4(b) authorizes partial redemption because "an option 'to redeem all' is not the same as an option 'to redeem which must include all.'" The court further noted that section 6.4(b) seemed to give the company certain rights in the event of a partial redemption under 6.4(a). It reasoned that because the word "all" could not have one meaning in section 6.4(a) and another in section 6.4(b), defendants' partial redemption attempt was valid. We disagree.

■■■■ Under the cardinal rule of contract construction, the parties' intent controls. *Berryhill v. Hatt,* 428 N.W.2d 647, 654 (Iowa 1988). Except where ambiguity exists, intent is determined by what the contract itself says. *Id.* In interpreting a contract, we give effect to language of the entire contract in accordance with its commonly accepted and ordinary meaning. *Home Fed. Sav. & Loan Ass'n v. Campney,* 357 N.W.2d 613, 617 (Iowa 1984). "All" is commonly defined as "the whole of ... each one of." Black's Law Dictionary 68 (5th ed. 1979). Applying this definition, it would appear that the parties intended that the redemption option cover each of the decedent's shares. In addition, the court's interpretation of the word "all" in section 6.4(a) overlooks language in that section making clear that exercise of the option on only part of the shares within six months after the shareholder's death renders the option "null and void." This we believe

evinces the parties' intent to disallow, not allow, partial redemptions. This is consistent with section 6.4(b), allowing redemption of "all" the decedent's shares when the legal representative chooses not to redeem them all under section 6.4(a).

■■■ Jean acknowledged at trial that the intent of section 6.4 was to permit a buy out upon the death of one of the brothers. A court should not give a contract a meaning that the parties did not in fact intend. *Home Fed.,* 357 N.W.2d at 617. We hold that the court erred in finding that section 6.4(b) authorized partial redemptions. Consequently, defendants' attempt to redeem fewer than all of Elmer's shares is void. *See Johnson v. Cedar Memorial Park Cemetery Ass'n,* 229 Iowa 749, 754, 295 N.W. 136, 139 (1940) (actions in violation of corporate charter would affect avoidance of those actions). This holding makes it unnecessary to address plaintiffs' other claimed errors concerning the transaction.

■■■ 2. *Limitation on redemption.* Our decision with respect to the illegality of the partial redemption largely answers the defendants' cross-appeal. Although the court found the redemptions "legally valid"—a position with which we disagree—it voided them on a determination that redemption was unnecessary to achieve equity. Defendants, on cross-appeal, argue that the by-laws clearly give the surviving brother the option to go beyond the "fifty-fifty" relationship. By its ruling, defendants assert, the court drastically rewrote the by-laws in contravention of the parties' intent.

We agree with the court's finding that the brothers intended an equal partnership during their lifetimes. That point is clear from the evidence adduced at trial. As discussed in the previous section, however, we believe that the corporate documents revealed an intent to give the surviving brother—acting on behalf of the corporation—the option of buying out the decedent's family. It appears, therefore, that the brothers did not intend the equality to be everlasting. The weakness in defendants' cross-appeal is that they did not exercise the buy out option. Instead, they attempted to wrest majority

control by redeeming only 1750 shares of Elmer's preferred stock.

■ Equity avoids giving one party an unfair, oppressive, or inequitable advantage over the other. *La Fontaine v. Developers & Builders, Inc.*, 261 Iowa 1177, 1185, 156 N.W.2d 651, 657 (1968). It allows the court a necessary flexibility to determine the equities between the parties. *Farmers Sav. Bank v. Gerhart*, 372 N.W.2d 238, 245 (Iowa 1985). Under the facts of this case, the district court properly invalidated the partial redemption, not only because to do so would upset the equal balance of power, but because partial redemption would disrupt that balance without full compensation for the minority shareholders. The parties' contract contemplated a total buy out. The court thus correctly invalidated action by Jean that was both inequitable and in contravention of the corporation's governing instruments.

C. *Corporate opportunity.* Plaintiffs next argue that the district court erred in finding that Jean breached no fiduciary duty by buying additional bank stock for his own account and the account of his personal holding company. Plaintiffs assert that such purchases, without notice to them or to the company, amounted to a usurpation of a "corporate opportunity." We disagree.

■ As a fiduciary, a corporate director may not secure a business opportunity that in all fairness should belong to the corporation. *Cookies*, 430 N.W.2d at 452; *Rowen v. LeMars Mut. Ins. Co.*, 282 N.W.2d 639, 660 (Iowa 1979). Plaintiffs assert that because the holding company's only purpose was bank ownership, the opportunity to purchase additional bank shares was "essential" to the company's business and of practical importance to it. They therefore claim that Jean breached his fiduciary duty by taking advantage of the stock purchase without prior notice to the company. Defendants respond that no corporate opportunity existed and, even if it had, the company could not have availed itself of the opportunity.

■ The general rule regarding "corporate opportunity" recognizes that

if there is presented to a corporate officer or director a business opportunity which

■ the corporation is financially able to undertake, [2] is, from its nature, in the line of the corporation's business and is of practical advantage to it, [3] is one in which the corporation has an interest or a reasonable expectancy, and by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

*Schildberg Rock Prods. Co. v. Brooks*, 258 Iowa 759, 768, 140 N.W.2d 132, 137 (1966) (quoting *Guth v. Loft, Inc.*, 23 Del.Ch. 255, 270, 5 A.2d 503, 511 (1939)). No constructive trust in favor of the corporation and its shareholders may be ordered, however, if any one of the above elements is missing. *Ontjes v. MacNider*, 232 Iowa 562, 579–80, 5 N.W.2d 860, 869–70 (1942). We believe the district court was correct here in finding insufficient proof that Jean took unlawful advantage of a corporate opportunity.

As the court noted, the shares Jean purchased in no way jeopardized the company's significant majority ownership of the bank. The company did not need the stock for the conduct of its business because it had already surpassed the eighty percent ownership threshold necessary to obtain the tax benefits for which it was formed. *See Ontjes*, 232 Iowa at 585–86, 5 N.W.2d at 872. Moreover, defendants tendered substantial proof that the company had no expectancy regarding the 400 additional shares. *Id.* at 585, 5 N.W.2d at 872.

The record further reveals, and plaintiffs fully admit, that the company was not financially positioned to purchase the 400 shares. Given this circumstance, and so long as the acquisition was not made with corporate funds, Jean was entitled to treat the opportunity as his own. *Id.* 5 N.W.2d at 870. The record reveals that Jean used his own funds to make the stock purchases. Thus we affirm the district court's finding that the record does not contain the proof necessary to sustain a corporate opportunity claim.

D. *Issuance of 2000 shares of common stock.* The district court struck down Jean's issuance of 2000 additional shares of common

stock on the ground the action was taken for the sole purpose of obtaining control of the company. Defendants urge on cross-appeal that the court's ruling is in error because a legitimate business purpose existed for the transaction.

We are guided in our analysis by the general rule set out by the Maryland Court of Special Appeals in *Mountain Manor Realty, Inc. v. Buccheri:*

> Directors may not exploit their official position to manipulate the issue of shares *solely* to perpetuate their own control of the corporation.... But an issue of stock that has the collateral effect of enhancing the power of incumbent management is not invalid if the transaction has as its principal purpose some proper corporate goal.... And management has not only the right but the duty to resist by all lawful means persons whose attempt to win control of the corporation, if successful, would harm the corporate enterprise.

55 Md.App. 185, 196, 461 A.2d 45, 52 (1983) (quoting *Heit v. Baird,* 567 F.2d 1157, 1161 (1st Cir.1977)).

The district court found that issuance of the 2000 additional shares was undertaken solely for the personal advantage of Jean's family to obtain control of the corporation. Jean asserted at trial, and argues on appeal, that his primary interest in issuing the stock was keeping the bank out of the control of those who "have no expertise in the banking business whatsoever." He also expressed concern that Elmer's family would sell the bank to outsiders, thereby threatening the positions of its managers. The record, however, does not bear out Jean's concerns.

Although plaintiffs admit their prior lack of involvement in the bank's operations, nothing other than Jean's bare assertions suggest that they could not competently oversee its management. Indeed, Beth and her sisters own a bank in Jefferson. Mary Beth is director of her husband's company and of a community college in Kansas. In addition, defendants tendered no competent evidence that plaintiffs intended to sell the bank. On the contrary, Beth testified that she had complete confidence in the bank's president, James Herrick, and the way the bank was being managed by him and other bank officers. Jean's fear, therefore, appears to be based on nothing more than speculation. Like the district court, we are not convinced that actions based on speculation can be equated with actions motivated by a "legitimate corporate purpose."

The district court's position is strengthened by this court's observations in *Carlson v. Ringgold County Mutual Telephone Co.,* 252 Iowa 748, 108 N.W.2d 478 (1961). There we said:

> It is a fraud for directors of a corporation, without the knowledge and consent of other stockholders, to subscribe for and to take the unissued stock to the enrichment of themselves and the detriment of the other stockholders.

*Id.* at 763, 108 N.W.2d at 486 (quoting 18 C.J.S. *Corporations* § 201a); *see also Fletcher* § 5158 (directors have no right to issue stock to themselves for purpose of obtaining control of corporation). In short, the court did not err in voiding the common stock issue.

### III. Conclusion.

To summarize, we affirm the district court's order enforcing Jean's right under the 1983 buy/sell agreement to purchase 600 shares of preferred stock held by Elmer. We likewise affirm the court's decision to void the company's issuance of 2000 shares of common stock to Jean, at his direction, as action undertaken to advance his personal interest rather than a legitimate corporate purpose. While we disagree with that portion of the court's decision that would interpret the corporate by-laws to permit partial redemption by the company of Elmer's preferred shares, and reverse the court's ruling to that extent, we affirm the court's ultimate refusal to enforce the redemption on equitable grounds. Finally, we affirm the court's

finding of insufficient proof on plaintiffs' posttrial claim regarding Jean's alleged usurpation of a corporate opportunity.

The clerk shall tax the costs of this appeal three-fourths to the plaintiffs and one-fourth to the defendants.

**AFFIRMED IN PART AND REVERSED IN PART ON THE APPEAL; AFFIRMED ON THE CROSS–APPEAL.**