# IN THE COURT OF APPEALS OF IOWA

No. 15-0912
Filed June 15, 2016

CAROLYN R. MORSE and ELAINE V. GREER,
individually and in their capacity as members
of Rosendahl Investments, L.L.C., and
ROSENDAHL INVESTMENTS, L.L.C.,
        Plaintiffs-Appellees,

vs.

NELS M. ROSENDAHL, individually and
in his capacity as a member of
Rosendahl Investments, L.L.C.,
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt,

Judge.


        Defendant appeals the district court decision granting specific

performance to plaintiffs in their breach of contract action and denying his

counterclaim. **REVERSED IN PART AND AFFIRMED IN PART.**


        Lawrence B. Cutler of Craig, Smith & Cutler, L.L.P., Eldora, for appellant.

        David A. Morse of Law Offices of David A. Morse, Des Moines, for

appellees.


        Considered by Tabor, P.J., and Bower and McDonald, JJ.

**BOWER, Judge.**

Defendant Nels Rosendahl appeals the district court decision granting specific performance to plaintiffs Carolyn Morse and Elaine Greer in their breach of contract action and denying his counterclaim. We reverse the decision of the district court granting Carolyn and Elaine specific performance on their request to have Nels transfer his interest in the parties' limited liability company for no consideration. We affirm the court's denial of Nels's counterclaim for dissolution of the company based upon oppression by Carolyn and Elaine.

## I.     Background Facts & Proceedings

Nels, Carolyn, and Elaine are siblings. In 2003 they inherited property from their parents. The siblings decided to create Rosendahl Investments, L.L.C., with their inherited property. Carolyn and Elaine each invested $342,041. Nels invested $262,041, after keeping $80,000 from his inheritance. Carolyn and Elaine each had a 36.46% ownership interest, while Nels had a 27.08% ownership interest. Carolyn was the managing member of the company.

Nels became dissatisfied with the company, in particular due to what he perceived as self-dealing by Carolyn.[1] On February 6, 2007, Nels sent Carolyn and Elaine an email stating, "I have been thinking about this LLC stuff. I never wanted to be in it." Elaine responded with an email, "So he's saying he wants out? How do we proceed?" Nels emailed back, "Yes I want out. I hope you remember I didn't want in to begin with." Carolyn sent an email directing Nels to

---

[1]     Although Rosendahl Investments provided all of the capital to purchase Jesse's Place, a strip mall in Urbandale, Carolyn gave her husband, Michael Morse, and his business partner a forty percent interest in Jesse's Place because they did not take a commission on the sale. Also, Carolyn gave Michael and his partner a contract to provide management services for Jesse's Place.

the Operating Agreement for Rosendahl Investments. No further action was taken by any of the parties at that time.

Nels filed a lawsuit against Carolyn and her husband. In recognition of a settlement reached in that action, on May 21, 2011, the siblings amended the terms of the Operating Agreement. They agreed Carolyn would remain as the manager and Michael could provide property management services, given full disclosure of the terms of his services were offered. They also agreed the company's investment portfolio would be managed by a third-party account manager rather than by Carolyn.

On July 16, 2011, Nels sent an email to Carolyn complaining about the investment in Jesse's Place and the amount of payments to Michael in management fees. Nels stated, "I really want to get away from this mess!" On September 7, 2011, he sent Carolyn an email stating, "I have been waiting for you to have some kind of motion trying to get me out. Clearly you were not sincere." Carolyn responded, "As far as sincerity, I sent you a note that asked for you to work with me on coming up with a way to get you out of the company as you have said you wanted to do, but have never formally asked for, per our agreement." Again, no further action was taken at that time on Nels's request.

On June 9, 2012, Nels sent an email to Carolyn and Elaine disagreeing with a proposed investment in a hog confinement facility. He stated:

> So rather than have legal issues again why don't we take advantage of the 10,000 an acre price and get me out.
> You won't have to deal with me anymore.
> Let's find a way to make it happen. I'll take 99 ac[res] by John and give you cash or a note to cover my end of the Jesse Place fiasco.

> According to the accountant it's the only way this works.
> You don't have the cash and you can use some extra when I'm out.
> Let's find the number that works.

Carolyn responded they were only investigating whether or not to invest in a hog confinement facility. Nels sent Carolyn an email on June 11, 2012, again stating he did not believe they should invest in a hog confinement facility. He also stated, "Anyway I'm tired of putting up with all the drama. I have a number from the accountant. It's time for me to go my own way. I'll take my land back and give you the cash." He also sent Carolyn a text message stating, "I don't want to be involved anymore. This is another loser."

On August 28, 2012, Carolyn and Elaine sent Nels a letter stating they considered his emails and texts as an intent to withdraw from Rosendahl Investments. They stated under the terms of the Operating Agreement their purchase price for Nels's shares was the value of his capital account, which at that time was zero. Carolyn and Elaine stated, "[A]ll our shares do have some value which may not be reflected in the capital accounts based upon the long-term nature of the company holdings." They made an alternative offer to pay Nels $150,000 for his share in the company. The letter stated if Nels did not accept the alternative offer to purchase his shares for $150,000 by September 11, 2012, then the buyout terms of the Operating Agreement would apply.

Carolyn sent Nels an email on September 7, 2012, asking whether he wanted to proceed with their offer or use the calculations described in the Operating Agreement. Nels responded on September 9, 2012, stating, "I do not want your offer! The offer you presented is not consistent with the operating

agreement." He stated he believed the offer presented by Carolyn and Elaine was too low and was not a legitimate offer. Nels stated he had hired an attorney who was having an independent accountant look over the matter.

On January 15, 2013, Carolyn and Elaine filed an action against Nels, claiming he had withdrawn from the company. Carolyn and Elaine asked for specific performance of the terms of the Operating Agreement, namely, an order compelling Nels to transfer his interest in the company to them.

Nels's answer denied giving notice of intent to withdraw from the company and stated Carolyn and Elaine did not have the right to his interest in the company. He raised the affirmative defense of unconscionability. Nels later filed a motion seeking to amend his answer to raise a counterclaim seeking dissolution of Rosendahl Investments. Nels also filed a motion for summary judgment claiming the plaintiffs had not produced any evidence he withdrew from the company.

Immediately prior to the trial on January 22, 2015, the court granted the motion to amend Nels's answer to add the counterclaim for dissolution of the company. The court denied the motion for summary judgment, finding there were genuine issues of material fact.

During the hearing, Carolyn and Elaine testified they interpreted Nels's email from June 9, 2012, as his notice of intent to withdraw from the company. Carolyn stated, "It's the totality of the language of Nels consistently asking to get out of the company." Nels testified he never intended to withdraw from the company. He stated he was attempting to negotiate a sale of his share of the

company with his sisters. Nels stated he believed the offer of $150,000 was too low based on the assets held by the company.

The district court issued a decision on April 30, 2015, finding, "The email Carolyn and Elaine received from Nels on June 9, 2012, manifests his notice to Carolyn and Elaine that he was withdrawing from [Rosendahl Investments] within the meaning of the Agreement." The court found Carolyn and Elaine responded to Nels in compliance with the terms of the Operating Agreement. The court found Nels refused the offer to purchase his interest in the company for $150,000. The court determined under the terms of the Operating Agreement, when Nels withdrew from the company, Carolyn and Elaine could purchase his share of the company for the value of his capital account, which was zero dollars. The court found, "The company has no obligation to pay him anything for his shares under this option." The court concluded Carolyn and Elaine were entitled to specific performance of the Agreement and Nels was required to transfer his interest in the company to them. The court determined the Operating Agreement was not unconscionable, oppressive, fraudulent, or illegal. The court denied Nels's counterclaim seeking dissolution of the company. Nels appeals the decision of the district court.

## II. Standard of Review

Specific performance is a form of equitable relief, and, therefore, our review is de novo. *Passehl Estate v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006). Also, the counterclaim alleging oppression by the other members of the company was tried in equity. *See Lange v. Lange*, 520 N.W.2d 113, 115 (Iowa 1994). In equity, we give weight to the district court's factual findings, especially

concerning the credibility of witnesses, but are not bound by those findings.  Iowa R. App. P. 6.904(3)(g); *Smith v. Iowa State Univ.*, 851 N.W.2d 1, 19 (Iowa 2014).

### III.    Notice of Withdrawal

Nels claims his email of June 9, 2012, did not constitute a notice of withdrawal under the terms of the Operating Agreement for Rosendahl Investments.  He states he did not intend to withdraw from the company and his email could not be considered as notice of withdrawal.  Nels claims he was attempting to sell his interest in the company to Carolyn and Elaine, which was permitted in the Operating Agreement.

Rosendahl Investments is a limited liability company subject to the Revised Uniform Limited Liability Company Act (RULLCA).  *See* Iowa Code § 489.106 (2013).  Under the RULLCA,

> A person is disassociated as a member from a limited liability company when any of the following applies:
> 1.  The company has notice of the person's express will to withdraw as a member, but, if the person specified a withdrawal date later than the date the company had notice, on that later date.

*Id.* § 489.602.  A company's operating agreement may specify "the time or the events upon the happening of which a member may disassociate."  *Id.* § 489.604(1).

The Operating Agreement for Rosendahl Investments provides:

> 9.1    Events of Withdrawal.  A Member ceases to be a Member of the Company and shall be deemed a "Withdrawing Member," and each Member not so withdrawing shall be deemed a "Non-Withdrawing Member," upon the occurrence of any of the following events (an "Event of Withdrawal"):
> (a)    A Member withdraws from the Company by giving ninety (90) days prior written notice of such Member's withdrawal to the other Members; provided, however, such withdrawal by a Member shall constitute a breach of this Agreement and such

Member shall be liable to the Company for any damages sustained by the Company as a result of such withdrawal, including but not limited to expenses related to reorganizing the Company if the withdrawal causes the Company to cease to be a limited liability company under the Act, and the Company may offset such damages against any amount otherwise distributable to such Member pursuant to Article VI of this Agreement.

Under section 9.4 of the Operating Agreement, upon the withdrawal of a member, the remaining members, "in their sole discretion," could decide whether the withdrawing member would continue to receive distributions or whether the remaining members would purchase the withdrawing member's share of the company for "the value of such Member's Capital Account." The value of a member's Capital Account, as defined in section 6.2, is based upon the member's contribution and share of net profits, decreased by net losses and distributions. Thus, the value of a member's Capital Account was based upon the company's profits and losses, not the value of the net assets held by the company.

A person may withdraw from a limited liability company by giving notice to the company of the person's "express will to withdraw as a member." Iowa Code § 489.602(1). The Operating Agreement for Rosendahl Investments states there must be written notice of withdrawal and the notice must be given to the other members of the company. Carolyn and Elaine testified they interpreted Nels's email from June 9, 2012, as his written notice of intent to withdraw from the company.[2]

---

[2] Nels's follow-up email and text from June 11, 2012, were to Carolyn alone, and so could not be considered as a notice of withdrawal because they were not sent to all of the other members of the company.

Setting aside the issue of whether an email could constitute written notice for purposes of the Operating Agreement, the text of Nels's email of June 9, 2012, does not indicate an intent to withdraw from the company. If Nels had intended to withdraw, then it was apparent under the terms of the Operating Agreement the remaining members could obtain his shares for the value of his Capital Account. There is no indication he was willing to transfer his interest under this scenario. To the contrary, he was clearly suggesting a sale of his interest in the company. Nels offered to accept ninety-nine acres of land and in exchange he would provide the company with cash or a note for the difference in value between his interest and the value of the land. He stated, "Let's find the number that works."

If he was intending to withdraw, and thus accepting the valuation of his interest as the value of his Capital Account, there would be no purpose in attempting to negotiate a sales price for his interest. We also note Nels had made many statements in the past, which were similar to those expressed in the June 9, 2012 email, and these statements were never interpreted by the parties as an expression of Nels's intent to withdraw from the company.

Section 8.2 of the Operating Agreement provides:

Permitted Transfers. Any Member may make a voluntary Transfer, or a Transfer as a result of death or dissolution, of all or any portion of the Units owned or held by such Member to the following Persons without obtaining the prior consent of a Manager and the non-transferring Members as required by section 8.1: (i) to the Company; (ii) to any existing Member; . . . .

This section would permit Nels to sell his interest in the company for an amount different than the value of his Capital Account. A sale under section 8.2 would

make sense from Nels's standpoint because the company had net assets of about $2.25 million on December 29, 2013, but had little net profits. At the time, Carolyn and Elaine claimed he had withdrawn from the company his Capital Account had a value of zero dollars.

On our de novo review, we find when Nels's email from June 9, 2012, is read as a whole, rather than considering a few phrases alone, it cannot reasonably be viewed as written notice of his withdrawal from the company. We disagree with the district court's conclusion Nels's rejection of the offer from Carolyn and Elaine to purchase his interest in the company for $150,000 was an acceptance his interest could be purchased for zero dollars, based on our finding the basic premise for their offer, that Nels had voluntarily withdrawn from the company, is not supported by the evidence.

We reverse the district court's decision finding Nels voluntarily withdrew from the company and Carolyn and Elaine were entitled to specific performance of the Operating Agreement permitting them to obtain Nels's interest in the company for no consideration. Because we have denied the claim for specific performance, we do not address Nels's affirmative defense the terms of the Operating Agreement were unconscionable.

## IV. Summary Judgment

Nels claims the district court should have granted his motion for summary judgment. "The denial of a motion for summary judgment is no longer appealable once the matter proceeds to a trial on the merits." *Lindsay v. Cottingham & Butler Ins. Servs., Inc.*, 763 N.W.2d 568, 572 (Iowa 2009). "After a trial on the merits, the denial of the motion for summary judgment merges with

the trial on the merits." *Id.* We do not consider Nels's claims concerning the denial of the motion for summary judgment.

## V. Oppressive Conduct

Nels claims the district court should have granted his counterclaim, asserting the company engaged in oppressive conduct and asking for dissolution of the company. On the application of a member of a limited liability company, the company may be dissolved when the managers or those members in control of the company, "[h]ave acted or are acting in a manner that is oppressive and was, is, or will be directly harmful to the applicant." Iowa Code § 489.701(1)(e)(2). The district court found, "Dissolution as requested by Nels in his counterclaim is not supported by this record."

In *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 670 (Iowa 2013), the Iowa Supreme Court discussed the term "oppressive" as used in section 490.1430(2)(b) of the Iowa Business Corporations Act, which provides for dissolution of a corporation based upon "illegal, oppressive, or fraudulent" action by directors of a corporation. The court noted, "Some courts have declined to enforce transfer price restrictions determined by formulas producing transfer prices so small in relation to the true value of the shares as to make the restrictions unconscionable or oppressive." *Baur*, 832 N.W.2d at 671. The court determined under the Iowa Business Corporations Act, "every shareholder may reasonably expect to share proportionally in a corporation's gains," and "[w]hen this reasonable expectation is frustrated, a shareholder-oppression claim may arise." *Id.* at 673. The supreme court concluded, "majority shareholders act oppressively when, having the corporate financial resources to do so, they fail to

satisfy the reasonable expectations of a minority shareholder by paying no return on shareholder equity while declining the minority shareholder's repeated offers to sell shares for fair value." *Id.*

On the record presented in this case, we determine dissolution of the company is not warranted at this time. While Nels has repeatedly stated he wanted to sell his interest in the company, he did not make a specific offer until his email of June 9, 2012. The evidence does not show a situation where Carolyn and Elaine have declined Nels's repeated offers to sell his interest for fair value. *See id.* At this juncture, we find the conduct of Carolyn and Elaine could not be considered oppressive.

We reverse the decision of the district court granting Carolyn and Elaine specific performance on their request to have Nels transfer his interest in the company for no consideration. We affirm the court's denial of Nels's counterclaim for dissolution of the company based upon oppression by Carolyn and Elaine. Costs of this appeal are assessed one-half to plaintiffs and one-half to defendant.

**REVERSED IN PART AND AFFIRMED IN PART.**